1
2
3
4                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
5                                  AT TACOMA

6    JAMES ANTHONY WILLIAMS,
                                              Case No. C19-5045 BHS-TLF
7                            Plaintiff,
                                              REPORT AND
8            v.                               RECOMMENDATION

9    STEPHEN SINCLAIR,                        Noted for March 13, 2020

10                           Defendants.

11          Plaintiff James Williams, proceeding *pro se* and *in forma pauperis*, brings this suit

12   pursuant to 42 U.S.C. § 1983 against defendants Stephen Sinclair, Karie Rainer, Bruce

13   Gage, and Tim Thrasher. Plaintiff alleges that defendants violated his Eighth

14   Amendment rights by issuing the Disruptive Hygiene Behavior Protocol ("Protocol") to

15   control his behavior.

16          Defendants have filed an early motion for summary judgment defending the

17   constitutionality of the Protocol. Dkt. 13. The Court previously extended the deadline for

18   plaintiff's response to October 11, 2019. Dkt. 19. Plaintiff has not responded to the

19   motion, but he has instead filed three motions, each seeking production of legal

20   documents and requesting a second extension of the deadline to file a response to

21   defendants' summary judgment motion. Dkts. 20, 23, 25.

22          The Court should grant in part defendant's motion to dismiss, with respect to

23   plaintiff's official-capacity claims against the named defendants. The Court should deny

24
25

in part defendants' motion to dismiss, with respect to the personal participation claims against the named defendants and the unnamed Doe defendants.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Plaintiff is currently housed in restrictive housing in the Special Offender Unit ("SOU") at Monroe Corrections Center ("MCC"). Defendants are senior Department of Corrections ("Department" or "DOC") officials: Stephen Sinclair, the Secretary of the Department of Corrections, Timothy Thrasher, Mission Housing Administrator, Dr. Bruce Gage, Chief of Psychiatry, and Dr. Karie Rainer, Director of Mental Health.

Defendants Thrasher, Dr. Gage, and Dr. Gage, among other DOC officials, created the Disruptive Hygiene Behavior Protocol in response to situations with inmates, including plaintiff, who routinely and intentionally smeared feces throughout their cells, belongings, and on their bodies. Declaration of Timothy Thrasher, Dkt. 14, at 2. Around October 2014, the Department enacted the Disruptive Hygiene Behavior Protocol as DOC Policy 320.255. Declaration of Timothy Thrasher, Exhibit 1, DOC Policy 320.255, Dkt. 14-1, at 2. The Department defined "disruptive hygiene behavior" as the intentional smearing of any bodily fluid, including but not limited to feces and urine, on one's person or anywhere in a cell. *Id.* at 17.

According to the Protocol, inmates who engage in disruptive hygiene behavior will be given clear options, beginning with the directive to clean their own cell. Thrasher Decl., Disruptive Hygiene Behavior Protocol, Dkt. 14-1, at 17. The Protocol's main incentive is the delayed service of meals – the inmate will not receive a meal until the cell has been cleaned by the inmate or the inmate has been removed to allow staff to clean. Dkt. 14, at 2. According to the defendants, this Protocol is not structured for the

use of meal deprivation as a punitive measure. *Id.* At any point when an inmate indicates compliance with staff directives regarding cleaning or removal from their cell, the inmate will be provided an opportunity to shower, clean clothing, and an appropriate meal. *Id.*

The content of the Protocol is undisputed between the parties. The steps of the Protocol are as follows: when corrections staff become aware of an inmate's disruptive hygiene behavior, they notify mental health staff. Dkt. 14-1, at 17. Staff then screen for safety concerns – such as such as a covered cell window, self-harm, or visible open wounds – and any safety concerns will be addressed first. If the inmate displays open wounds, the inmate is immediately removed from their cell, cleaned, and treated. *Id.* An appropriate meal is then provided at the usual time. *Id.* If no safety concerns are found, staff must provide cleaning supplies to the inmate and request that the inmate clean the cell. *Id.* If the inmate refuses to clean, a screen is placed in front of the cell door and the inmate should be notified that before the inmate receives the next meal, the inmate must clean the cell and take a shower. *Id.* At normal tier check times, the cell is checked for the inmate's compliance, and cleaning supplies should be offered again. *Id.* Another check occurs at the first mealtime following the behavior. The inmate will not be provided a meal if the cell has not been cleaned. *Id.* The inmate must be informed of the reason for withholding the meal, directed again to clean the cell, and informed that the inmate will be removed from his cell if the cell is not clean by the time the next meal is served. *Id.*

If the inmate fails to clean their cell by time of the second meal after the behavior, the shift lieutenant and mental health professionals remove the inmate, after

determining whether dialogue with the inmate or use of an entry team is in the best interest of the inmate and staff. Dkt. 14-1, at 17. The inmate is then directed to submit to wrist restraints. Dkt. 14-1, at 18. If the inmate does not submit to wrist restraints, the Protocol allows for the inmate to be extracted from the cell by staff as appropriate, which may include the use of OC, a form of pepper spray. Dkt. 14-1, at 18.

When OC is used, the inmate should be provided an opportunity to decontaminate after removal. *Id.* If the individual refuses OC decontamination or to shower, staff should decontaminate the inmate, which may include the cutting and removal of clothes. *Id.* Following decontamination, if the inmate's behavior remains inappropriate and disruptive at this juncture, the inmate may be placed in a restraint chair until the situation has deescalated and the inmate has calmed down. *Id.*

Once the inmate's behavior is appropriate, the inmate is placed in a shower with a bar of soap and given 10 minutes to shower. *Id.* The inmate may choose whether take a shower, during which period trained staff should clean the contaminated cell. *Id.* After the shower, the inmate should receive clean clothing to replace any soiled clothing, upon which the inmate should be returned to the same cell, if possible. *Id.* Once re-situated in the cell, the inmate should be provided with an appropriate meal. *Id.*

The Protocol's design allows inmates the opportunity to shower, receive clean clothing, and a meal as soon as they comply with staff directives regarding cleaning or removal from their cells. Dkt. 14, at 2. Under the Protocol, inmates would miss one meal following disruptive hygiene behavior. If the inmate does not comply by the second mealtime, the inmate will be removed from his cell, decontaminated, and provided a

1    meal. *Id.* No meals are missed at all if the inmate complies when first presented with
2    cleaning supplies. *Id.*

3        Defendants assert that they developed the Protocol out of two penological
4    concerns. The first concern was the safety of the inmate and staff with respect to
5    exposure to bodily fluids: the Protocol was intended by defendants to create a
6    predictable incentive-based system to reduce such exposure during de-escalation of
7    disruptive hygiene behavior. Dkt. 14, at 2.

8        Exposure to bodily fluids carries a risk of infection or other adverse health effects
9    to both the inmate and staff. Defendants explicitly included this concern in the written
10   Protocol on the risk presented to the inmate by the presence of bodily fluids when the
11   inmate has open wounds or is eating. *See* Dkt. 14-1, at 17 (referring to "safety concerns
12   … e.g., covered window, self-harm occurring, visible open wounds" and explaining that
13   the inmate who has not cleaned a contaminated cell "will not be provided a meal due to
14   potential health hazards that may exist."). Defendants assert that they structured the
15   Protocol to mitigate these risks, so that at each decision point, the inmate is provided
16   the opportunity to comply with directives which work towards removing both the
17   inmate's and staff's exposure to bodily fluids. Dkt. 14, at 3.

18       Defendants assert the Protocol's only other goals were to prevent manipulation
19   of correctional placement and decrease use-of-force incidents. Dkt. 14, at 3. Because
20   the Protocol allows staff to return the inmate to his own cell, rather than moving the
21   inmate to a clean cell, the Protocol limits an inmate's ability to engage in disruptive
22   hygiene behavior with the hopes of receiving a new cell, unit, or facility placement.  *Id.*
23   Defendants assert that this prevents inmates from obtaining placement near certain

24
25

other preferred inmates, which could affect prison safety, and prevents inmates from avoiding or availing themselves to particular programming or mental health treatment, a practice which would interfere with other inmates' access to those resources. *Id.*

Defendants are supervisory officials who issued the Protocol. Dkt. 13, at 12. Defendants assert that they have no knowledge or connection to any incidents that do not conform to the Protocol, and they are not responsible for implementing the Protocol as part of the prison's day-to-day operations. *Id.* at 10. Plaintiff is suing the named defendants for their role in the creation of the Protocol and seeks to hold them responsible for the injuries caused by both the official policy and its unofficial misuse. Dkt. 6, at 13.

Plaintiff admits to engaging in disruptive hygiene behavior, but he claims that the Protocol does not reduce how often he engages in such behavior. Rather, he "smears more than ever." Dkt. 6, at 17. Plaintiff regularly interferes with the plumbing in his cell, flooding his cell with water from his toilet, in addition to smearing his bodily fluids. *Id.* at 28, 33.

According to plaintiff, the Protocol is punitive and not preventative. In his words, defendants created the Protocol specifically for him as punishment for what he terms "the symptoms of SHU-syndrome [a disease resulting from prolonged solitary confinement] … the most devastating mental illness there is." *Id.* at 8. Plaintiff claims defendants are violating his Eighth Amendment rights by "denying food to the mentally ill in solitary confinement." *Id.* at 1.

Plaintiff argues that his disruptive hygiene behavior is a symptom of severe mental illness. Plaintiff asserts that he should reasonably be expected to increasingly

engage in disruptive hygiene behavior when instructed to clean his cell or informed that he will not be provided a meal. Dkt. 6, at 11, 12. Plaintiff claims that the enforcement of the Protocol induces him to cut himself, and he states that if the Protocol continues, plaintiff will self-mutilate until he eventually kills himself. Dkt. 6, at 29.

Plaintiff also raises claims against defendants for prison staff's failure to follow the Protocol as written. Dkt. 6, at 12. Plaintiff alleges that abuse of the Protocol is part of a larger and historically repetitive pattern that amounts to an unofficial DOC custom and/or policy, adopted and approved by the defendants. *Id.*

Plaintiff alleges that the unwritten DOC policy is to punish plaintiff more harshly for disruptive hygiene behavior, denying him meals for an unspecified number of days at a time. He alleges that prison staff do not bring cleaning gear but fabricate plaintiff's refusal of cleaning gear in their write-up of the incidents, or plaintiff will clean but staff claim that he has not, which causes plaintiff to miss three to six meals at a time. Dkt. 6, at 24. Plaintiff claims that when plaintiff cuts himself and floods his cell with water, the defendants turn off his water and take his bedding and clothing. Dkt. 6, at 33. Plaintiff alleges that he is left without running water, bedding, and clothing for days or weeks, and that he cannot eat, drink, or sleep during such periods. *Id.*

Plaintiff's claims involve multiple incidents of undetermined date, and they may be organized according to his facility assignments. At WSP, between January 11, 2016 and March 2017, plaintiff claims that he was denied 20 to 40 meals. Dkt. 6, at 36-37. During this period, he alleges that twice he was denied food for two days at a time. *Id.* at 38. Plaintiff objects to the use of pepper spray as excessive force on one occasion during this period. Plaintiff asserts that he smeared feces on his cell light, was denied a

meal, and then smeared feces on his cell window to "try to force them to feed me" after which he was sprayed with OC as punishment. *Id.* Plaintiff claims that due to the application of the Protocol following false accusations of smearing feces and refusing to clean, he missed 22 meals during a 28-day period in November 2016. *Id.* at 37.

Between March 30th and August 30th, 2017[1], plaintiff alleges that he was denied another 20 to 40 meals at SCCC. Dkt. 6, at 37. On one occasion, plaintiff asserts he was denied 4 meals in a row and left alone and naked in a shower stall for over 12 hours; on another occasion, plaintiff was again denied four consecutive meals and left eight hours in the shower, where plaintiff cut himself. Dkt. 6, 39. Plaintiff also claims to have been left alone for two weeks in a closet-like space approximately 7 feet long by 2 feet wide, where he was denied "many meals" in purported accordance with the Protocol. *Id.* at 40. Plaintiff alleges that on one occasion when he was deprived of a meal, he became suicidal and cut himself a second time. *Id.* On another occasion, plaintiff alleges that he was deprived of two meals and left in the shower for "several hours" without supervision or staff intervention, until finally he tore the shower nozzle from the wall, attempted to break the wall tiles, and cut himself when he lost control of the shower head and it struck plaintiff's head. *Id.* Plaintiff claims that he cut himself on two more occasions in response to being informed of meal deprivation. *Id.* at 40-41.

Finally, plaintiff claims that between September 2017 and June 2018 at MCC, he was denied 20 to 25 meals. Dkt. 6, at 41. In response to these meal deprivations, plaintiff claims that he cut himself on three separate occasions. *Id.* at 41-42.

---

[1] Plaintiff's complaint lists the time period as both 2017 and 2018 for these allegations, leaving ambiguity when compared to the other allegations; the undersigned assumes for the purposes of the motion (construing the allegations liberally because plaintiff is pro se) these allegations mostly likely occurred in 2017. *See* Dkt. 6, at 39, 41.

1

Plaintiff mentions prospective defendants (which, he asserts, he cannot name

2

because "prison staff" are allegedly hiding his grievances, infractions and other legal

3

documents). Dkt. 6, at 36. Plaintiff at one point in his complaint explicitly declares that

4

he is not suing any others except the four named defendants who created and

5

implemented the Protocol, yet he also names five, or possibly six, individuals that

6

allegedly have personal involvement in his alleged mistreatment.[2] Dkt. 6, at 38. Plaintiff

7

indicates his belief that he would be able to provide identifying information for all the

8

specific defendants after discovery – he states that he would need the defendants to

9

give him access to his prior grievance filings across six DOC facilities. *Id.* at 36.

10

Construing plaintiff's complaint liberally, the Court should find that plaintiff has

11

effectively included Doe defendants in his complaint, alleging their personal involvement

12

in unconstitutional deprivation of food and medical necessities.

13

Plaintiff requests that the Court declare the Protocol unconstitutional and order

14

an injunction to forbid its further use at all DOC facilities. He further requests an

15

injunction against the defendants to implement a new protocol that guarantees inmates

16

are fed all their meals on time, even when they engage in disruptive hygiene behavior.

17

Finally, plaintiff is requesting damages for his injuries. Based on injunctive relief sought,

18

the undersigned construes plaintiff to be suing the four named defendants in both their

19

personal and official capacities.

20

21

22

23

24

25

[2] Plaintiff names "guards Osborn; Michel; Galloway; Lieutenant Florez and Lt. Brewer, possibly guard Cole" as having been involved in at least one of the incidents in which he was wrongfully deprived for food, while also declaring, "I am not sueing them – I am just sueing the 4 Olympia officials… who created and implemented the protocol." Dkt. 6, at 38.

DISCUSSION

Summary judgment is supported "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP) 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine dispute concerning a material fact is presented when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

When the Court considers a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.,* at 255. Yet the Court is not allowed to weigh evidence or decide credibility. *Anderson v. Liberty Lobby, Inc.*, at 255. If the moving party meets their initial burden, an adverse party may not rest upon the mere allegations or denials of his pleading; his or her response, by affidavits or as otherwise provided in FRCP 56, must set forth specific facts showing there is a genuine issue for trial. FRCP 56(e)(2). The Court may not disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

If a summary judgment motion is filed early in the litigation – before there has been a realistic discovery opportunity relating to each party's theory of the case – the

1  District Court should grant any FRCP 56(d) motion "fairly freely". *Jacobson v. United*

2  *States Department of Homeland Security,* 882 F.3d 878, 883-84 (9th Cir. 2018).

3        In response to the motion for summary judgment, the nonmoving party is

4  required to present specific facts, and cannot rely on conclusory allegations. *Hansen v.*

5  *U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific

6  facts that are presented by the non-moving party, considered along with undisputed

7  context and background facts, would show that a rational or reasonable jury might

8  return a verdict in the non-moving party's favor based on that evidence. *Emeldi v.*

9  *University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

10        To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the

11  conduct complained of was committed by a person acting under color of state law, and

12  (b) the conduct deprived a person of a right, privilege, or immunity secured by the

13  Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535

14  (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section

15  1983 is the appropriate avenue to remedy an alleged wrong only if both of these

16  elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

17

18        *A.  Supervisory Liability Claims Against Named Defendants*

19        Plaintiff has brought this action specifically against the four named defendants to

20  attack the constitutionality of the protocol. Dkt. 6, at 12. The parties do not dispute that

21  the four named defendants are in a position to decide policy at DOC facilities and that

22  defendants are responsible for the creation and implementation of the Protocol.

23  Plaintiff's claim relies on the theory of supervisory liability under 42 U.S.C. § 1983 that

24

25

1    holds supervisory officials accountable if they implement a policy so deficient that the

2    policy "itself is a repudiation of constitutional rights" and is "the moving force of a

3    constitutional violation." *See Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Such a

4    suit may be brought against state officials in their official capacities, only if treated as a

5    suit against the state. *Holley v. Cal. Dep't of Corrs.*, 599 F.3d 1108, 1111 (9th Cir.

6    2010).

7         While a plaintiff may seek prospective injunctive relief in an official-capacity suit,

8    the Eleventh Amendment prohibits a plaintiff from seeking monetary damages. *See*

9    *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985); *Pena v. Gardner*, 976 F.2d 469, 472

10    (9th Cir. 1992) (Eleventh Amendment bars plaintiff from bringing federal damages

11    claims against Washington State officials in their official capacities); *Flint v. Dennison*,

12    488 F.3d 816, 825 (9th Cir. 2007) (state officials sued in their official capacities for

13    prospective injunctive relief are persons subject to suit under § 1983).

14         To the extent that plaintiff is suing defendants in their official capacity, defendants

15    are immune to any suits for damages regarding the issuance of the Protocol, although

16    plaintiff's suit for prospective injunctive relief against the Protocol will be considered

17    below on the merits.

18

19          *a. Constitutionality of the Protocol*

20         Plaintiff's self-harm implicates the responsibility of the Department to treat

21    plaintiff's mental health; yet, as discussed below, the Court should not be persuaded by

22    the plaintiff's argument that his self-inflicted wounds indicate that the Protocol is

23    unconstitutional – plaintiff does not plausibly show any genuine dispute of material facts

24

25

1    that the Protocol on its face or as applied causes a situation where the defendants fail to

2    provide adequate meals to sustain inmates' health.

3        The Eighth Amendment requires that prison officials "provide humane conditions

4    of confinement." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer*

5    *v. Brennan*, 511 U.S. 825, 832 (1994)). To establish an Eighth Amendment conditions of

6    confinement claim "requires a two-part showing." *Id.*  First, an inmate must make an

7    "objective" showing that he was deprived of "the minimal civilized measure of life's

8    necessities." *Id.* (quoting *Farmer*, 511 U.S. at 834). Second, the inmate must make a

9    "subjective" showing that this "deprivation occurred with deliberate indifference to the

10    inmate's health or safety." *Id.* A supervisor is liable for deliberate indifference when his

11    or her policies constitute a moving force behind an inmate's constitutional infringement.

12    *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1447-8 (9th Cir. 1991) (holding that a

13    supervisor could be found liable for deficient policies in response to prison

14    overcrowding, which posed a serious safety risk to inmate personal security).

15        The Eighth Amendment protects a prisoner's right to receive food "adequate to

16    maintain health." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). The "repeated

17    and unjustified failure" to provide "adequate sustenance" is a "sufficiently serious"

18    deprivation of "the minimal civilized measure of life's necessities." *Mendiola-Martinez v.*

19    *Arpaio*, 836 F.3d 1239, 1259 (9th Cir. 2016) (quoting *Foster*, 554 F.3d at 814). The

20    Ninth Circuit has held that the denial of 16 meals over 23 days, combined with the

21    inmate's allegations of dizziness, weight loss, and headaches, supported the inference

22    that the inmate's nutrition was inadequate to support his health. *Foster*, 554 F.3d at 813

23    and n.2.

24

25

Yet prison policies may justifiably control what and how much prisoners eat, particularly with respect to safety, which is a legitimate penological concern. "Receipt of food may be contingent upon the prisoner following a prison policy that is reasonably related to mealtime safety, regardless of whether that policy is in written form." *Foster v. Redenius*, No. 06-CV-0792-BLW-MHW, 2009 WL 1212888, at *7 (E.D. Cal. May 4, 2009) (citing *Foster v. Runnels*, 554 F.3d at 813-14 (recognizing the difference between using food deprivation as a punishment versus establishing a reasonable condition to the receipt of food)). Furthermore, although a prisoner who deliberately fails to follow the mealtime protocol should be protected from starvation, a "prison cannot be forced by such tactics to change an otherwise reasonable rule." *Id.* at *7 (citing *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006)). An inmate who fails to follow a mealtime protocol may be reasonably understood as having rejected the food. *Id.*

Plaintiff argues that the Protocol restricts plaintiff's food intake without a legitimate penological purpose and serves as a form of unconstitutional punishment for involuntary smearing of bodily fluids. Dkt. 6, at 12. Defendants argue that the meal deprivation from the Protocol does not constitute a failure to provide food adequate to maintain plaintiff's health or otherwise create a risk to plaintiff's health. Dkt. 13, at 12. Defendants argue that the Protocol is justified in delaying meals, due to the safety hazard present when food is transferred to a room with biohazardous and unsanitary contamination. Dkt. 14, at 2. Defendants assert that according to the Protocol, no inmate is to miss more than one meal at a time. Dkt. 13, at 10.

Plaintiff supports his assertion that the policy was actually intended to punish plaintiff for his behavior based on a conversation with prison staff where plaintiff heard

the policy was meant for him, as the only one to smear his cell every day. Dkt. 6, at 17.

Taken in a light most favorable to plaintiff and assuming that the defendants had plaintiff

specifically in mind when creating the Protocol, this fact would still not suffice to

discount the legitimate penological objectives asserted by Defendants and explicitly

contained in the Protocol. Delaying the delivery of no more than one meal until the

biohazard of smeared feces is no longer present is not sufficiently serious to implicate

the Eighth Amendment, where the facts establish the legitimate objective of protecting

inmate and staff safety regarding exposure to bodily fluids. Plaintiff himself does not

dispute that disruptive hygiene behavior constitutes a risk to inmate health, including in

his complaint an account of a severe infection he incurred in 2012 when he bit himself

and smeared feces in the wound. Dkt. 6, at 20-21.

Plaintiff's complaint likewise does not dispute that he missed meals in relation to

his disruptive hygiene behavior and his subsequent refusal to comply with the directives

to clean his cell. Dkt. 6, at 23. Plaintiff's argument that his disruptive hygiene behavior

and self-harm are involuntary is not supported by the facts stated in his pleadings and

motion documents, given plaintiff's own account of his determination to continue

smearing until the Protocol is changed, and his description of his self-harm as an

emotional response to being informed of the consequences of the protocol. Dkt. 6, at

18, 22, 23.

In this case, compliance with the Protocol's directives to clean one's cell is a

reasonable condition to the receipt of food, and Plaintiff's failure to comply may be

reasonably viewed by Defendants as Plaintiff's rejection of food. Plaintiff has failed to

establish a genuine dispute of material facts showing that the Department officials acted

1    with deliberate indifference to his health or safety in issuing the Protocol. The

2    undersigned concludes there is no genuine dispute of material fact regarding the

3    Protocol and the defendants did not violate plaintiff's constitutional rights by issuing the

4    Protocol. Therefore, **the Court should grant summary judgment and dismiss these**

5    **claims with prejudice**.

6

7                      *b.  Alleged Misuse of the Protocol*

8            Plaintiff's claims against defendants for the actions of prison staff rely on an

9    alternative theory of supervisory liability, according to which a supervisory official may

10   be liable for the actions of subordinates based on another theory that is different from

11   the policy theory described above. The supervisor may be deliberately indifferent and

12   liable only if "there exists either (1) his or her personal involvement in the constitutional

13   deprivation, or (2) a sufficient causal connection between the supervisor's wrongful

14   conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir.

15   2011). Such a causal connection may be established by the supervisor's own "culpable

16   action or inaction in the training, supervision, or control of his subordinates; for his

17   acquiescence in the constitutional deprivation; or for conduct that showed a reckless or

18   callous indifference to the rights of others." *Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 798

19   (9th Cir. 2018) (quoting *Starr*, 652 F.3d at 1208).

20           Plaintiff further argues that the four defendants were deliberately indifferent to his

21   health and safety when prison staff repeatedly refused to provide him with meals at the

22   second mealtime or failed to otherwise follow the Protocol. Yet plaintiff's claims include

23   no allegations connecting the incidents of Protocol misuse to any of the named

24

25

defendants, regardless of whether this alleged abuse would constitute a violation of plaintiff's constitutional rights. Plaintiff has not alleged facts showing that defendants personally participated in the misuse (indeed his complaint specifies that there were no such incidents), and he attributes all the objectionable actions to various subordinate prison staff. Neither has plaintiff alleged a causal connection between the defendant's issuance of the Protocol and the failure of prison staff to follow the Protocol – i.e., that the defendants personally failed to train or supervise their subordinate staff in application of the Protocol, that defendants acquiesced to the actions of the prison staff violating the Protocol, or that defendants showed reckless or callous indifference to the rights of others.

Plaintiff's sole argument regarding defendant's liability relies on simple *respondeat superior*, which is not available in a § 1983 claim. *See, e.g., Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018); *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991). A supervisor may only liable for the acts of his subordinates if the supervisor participated in or directed the violations, or if the supervisor knew of the violations and failed to act to prevent them. *Preschooler II v. Clark Cty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007). The facts as alleged by plaintiff are too tenuous to establish any policy, custom or practice created by defendants or that defendants had knowledge of the misuse of the protocol by staff. Furthermore, plaintiff has also failed to allege any facts related to the deterioration of his health due to the meals he missed or otherwise indicating that the diet he received under the Protocol was inadequate. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1259 (9th Cir. 2016) (inmate lacked sufficient evidence to survive summary judgment by failing to provide

1    any evidence that the diet she received was inadequate). Plaintiff has therefore failed to

2    state a claim against the named defendants.

3        Defendants brought this motion for summary judgment before discovery began,

4    however, and due to plaintiff's refusal to respond before some discovery has been

5    permitted, plaintiff has not yet addressed this deficiency in his complaint. Therefore, the

6    undersigned cannot find that granting leave to amend at this juncture would be futile.

7        In accordance with Rule 56(d), the Court should **deny defendants' motion for**

8    **summary judgment as to these claims and permit plaintiff to amend his complaint**

9    and address this deficiency. As discussed below, plaintiff should be permitted to amend

10   his claims against remaining Doe defendants. If the Court so allows this amendment,

11   then plaintiff should also be permitted to amend his complaint to include facts (if any

12   such facts exist) that may demonstrate the four named defendants' personal

13   participation in the violation of the Protocol.

14

15        *B.  Claims against Unnamed Defendants*

16        Reading the complaint liberally, the undersigned construes plaintiff's complaint

17   as having alleged cognizable claims against unnamed Doe defendants for violations of

18   plaintiff's constitutional rights. Although plaintiff has not specified precise dates or

19   individuals, plaintiff's allegations that he was denied meals several days at a time and

20   left without supervision in the shower for hours at a time while he engaged in self-harm

21   are pled with enough specificity for the Court to recognize an Eighth Amendment claim

22   for failure to provide food adequate to maintain health and deliberate indifference to the

23   risks to plaintiff's health posed by his suicidal behavior. *See* Dkt. 6, at 33-41.

24

25

1      Defendants' summary judgment motion does not address plaintiff's claims

2  against the unnamed defendants. The Court, on examining plaintiff's complaint and

3  motions, interprets the combined pleadings and motions as a request for more time and

4  the initiation of discovery to properly identify the defendants and describe precisely what

5  each defendant allegedly did, or failed to do. Plaintiff alleges that he has been unable to

6  secure copies of his grievances and other legal documents without the assistance of the

7  discovery process. Dkt. 6, at 36. Plaintiff's claims involve the conduct of specific prison

8  staff who personally interacted with plaintiff, and as plaintiff asserts, their identity would

9  be found in documents plaintiff has previously submitted to the prison's administrative

10  process. *Id.*

11      The Court should allow limited discovery in this instance. This would allow

12  plaintiff to determine the identity of the persons that he believes are potential

13  defendants in his case, and to allege any acts or omissions that those individuals may

14  have undertaken with respect to his claims, so that he may file a more complete

15  amended complaint—that would supersede his original complaint. *See Semitool, Inc. v.*

16  *Tokyo Electron Am., Inc.,* 208 F.R.D. 273, 276 (N.D. Cal. 2002); *ZG TOP Technology*

17  *Co., Ltd. v. Doe,* No. C19-92-RAJ, 2019 WL 917418 (W.D. Wash. February 25, 2019)

18  (good cause is shown where, considering the administration of justice, the need for

19  expedited discovery outweighs prejudice to the party that is responding to the

20  discovery). "In evaluating whether a plaintiff establishes good cause to learn the identity

21  of Doe defendants through early discovery, courts examine whether the plaintiff (1)

22  identifies the Doe defendant with sufficient specificity that the Court can determine that

23  the defendant is a real person who can be sued in federal court, (2) recounts the steps

24

25

taken to locate and identify the defendant, (3) demonstrates that the action can

withstand a motion to dismiss, and (4) proves that the discovery is likely to lead to

identifying information that will permit service of process." *ZG TOP Technology Co., Ltd.*

*v. Doe; see also, Columbia Ins. Co. v. seescandy.com,* 185 F.R.D. 573, 578-80 (N.D.

Cal. 1999). These elements have been met.

In accordance with Rule 56(d), the Court should **deny defendants' motion in**

**part for summary judgment on the claims against the Doe defendants and permit**

**the parties to engage in limited discovery** to allow plaintiff to amend his complaint

with all defendants named. If the Court should accept this recommendation, the

undersigned will direct the parties **to meet and confer within 14 days of service of**

**the Court's order**, pursuant to Fed. R. Civ. P. 26(f) and Western District of Washington

Local Rule (LCR) 16 (a),(c) to agree upon an expedited, narrowly tailored process for

exchanging early discovery.

### C.  *Qualified Immunity*

Unless plaintiff makes a two-part showing, qualified immunity shields government

officials from liability. The plaintiff must show both: the official(s) violated a federal

statutory or constitutional right, and – at the time of the alleged act or failure to act there

was clearly established law that defined the contours of the federal right objectively

putting the official(s) on notice – i.e., every reasonable official would understand that

what they are doing is unlawful. *Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019);

*District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

1    When qualified immunity is reviewed in the context of a defense motion for

2    summary judgment, the evidence must be considered in the light most favorable to the

3    plaintiff with respect to central facts.  *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per

4    curiam). If there is a genuine issue of material fact concerning both: (1) Whether it

5    would be clear to a reasonable officer that their conduct was unlawful under the

6    circumstances they confronted, and (2) Whether the defendant's conduct violated a

7    constitutional right" then summary judgment granting qualified immunity is not

8    appropriate. *Bonivert v. City of Clarkston,* 883 F.3d 865, 871-72 (9th Cir. 2018).

9    Defendants' behavior need not previously have been declared unconstitutional.

10   *Nelson v. City of Davis*, 685 F.3d 867, 884 (9th Cir. 2012). But "'existing precedent must

11   have placed the statutory or constitutional question *beyond debate*,' such that 'every'

12   reasonable official – not just 'a' reasonable official – would have understood that he was

13   violating a clearly established right." *Morales*, 873 F.3d at 823 (quoting *Ashcroft v. al-*

14   *Kidd*, 563 U.S. 731, 741 (2011)) (emphasis added by court of appeals).

15   Plaintiff has not shown that the Protocol clearly violated his right to receive

16   adequate food. Taken in the light most favorable to the plaintiff, the facts do not show

17   that there would be any constitutional violation under clearly established law. The Ninth

18   Circuit, in *Foster v. Runnels*, 554 F.3d 807 (9th Cir. 2009), established that a deprivation

19   of 16 meals over 23 days, combined with allegations of deterioration of the inmate's

20   health, supported the inference that the inmate's nutrition was inadequate to support his

21   health. However, plaintiff has produced no evidence that the Protocol itself, which

22   deprives inmates of up to one meal at a time, provides insufficient food to maintain

23   inmate health. Plaintiff has neither provided allegations of how his health deteriorated as

24

25

a result of the allegedly inadequate amount of food, nor can the plaintiff supply facts that would show that the issuance of the Protocol requires meal deprivations comparable to that in *Foster.*

Accordingly, the Court should find as there is no genuine dispute of material facts regarding the constitutionality of the Protocol, defendants are entitled to qualified immunity for issuing the Protocol as to all claims for damages. Regarding the claims of defendants' causal connection to violations of the protocol and the claims against the Doe defendants, the undersigned declines to recommend any decision on the issue of qualified immunity – such a decision would be premature, given the early nature of this motion for summary judgment.

### D. *Amended Complaint*

The undersigned recommends **that plaintiff be directed to file an amended complaint within 60 days of the Court's order on the report and recommendation (if the Court adopts this report and recommendation)**, which shall include all of plaintiff's claims against all intended defendants, including any "Doe" or unnamed defendants, all the facts connecting defendants' conduct to plaintiff's conditions of confinement and medical claims, and any other relevant facts or allegations of violations of plaintiff's constitutional rights. If plaintiff files an amended complaint, it must be legibly rewritten or retyped in its entirety and contain the same case number. The proposed complaint should be self-contained or incorporate any externally alleged facts by reference; any cause of action alleged in the original complaint that is not alleged in the amended complaint is waived. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir.

1997), *overruled in part on other grounds*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012). The amended complaint will act as a complete substitute for the complaint, and not as a supplement. In the amended complaint, plaintiff may not re-allege claims dismissed from this action. Any new claims raised in the amended complaint must relate only to the remaining claims alleged in the complaint.

Furthermore, if plaintiff files an amended complaint, plaintiff is directed to use Section IV "Statement of Claim" portion of the complaint form provided by the Court to write out short, plain statements telling the Court: (1) the constitutional right plaintiff believes was violated; (2) the name of the person (defendant) who violated the right; (3) exactly what that person did or failed to do; (4) how the action or inaction of that person is connected to the violation of plaintiff's constitutional rights; and (5) what specific injury plaintiff suffered because of that person's conduct. *See Rizzo v. Goode*, 423 U.S. 362, 371–72 (1976).

An amended complaint will be screened to determine whether it states a claim for relief cognizable under 42 U.S.C. § 1983. If the amended complaint is not timely filed or fails to adequately address the issues raised herein, the undersigned will recommend dismissal of this action as frivolous under 28 U.S.C. § 1915, and the dismissal will count as a "strike" under 28 U.S.C. § 1915(g). Plaintiff should be aware that he has already "struck out" in at least three prior cases, and therefore his amended complaint must indicate that plaintiff is "under imminent danger of serious physical injury," or else plaintiff's *in forma pauperis* status shall be revoked. 28 U.S.C. § 1915(g).

If the Court adopts this Report and Recommendation, failure to file a second amended complaint within 60 days of the Court's order adopting the Report and

Recommendation will result in the Court recommending dismissal of these claims and the remaining defendants from the action.

<u>IN FORMA PAUPERIS STATUS ON APPEAL</u>

The Court must also decide whether plaintiff's *in forma pauperis* status should continue on appeal. *See* 28 U.S.C. §1915(a)(3) ("an appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith"). The Court must determine whether appeal is frivolous or malicious, or whether it fails to state a claim on which relief may be granted. *See* 28 U.S.C. §1915(e)(2)(B)(i)&(ii).

While the Court was not persuaded on the merits of plaintiff's claim, there is no evidence that his appeal is frivolous or is taken in bad faith. Accordingly, the Court recommends that *in forma pauperis* status should continue on appeal.

<u>CONCLUSION</u>

Based on the foregoing discussion, the undersigned recommends the Court **grant in part** defendants' motion for summary judgment and **dismiss with prejudice** the claims against the four named defendants for issuing the Disruptive Hygiene Protocol. The Court should not dismiss the supervisory liability claims against defendants alleging their personal participation in the misuse of the Protocol, and it should not dismiss the claims against the unnamed Doe defendants.

1    The parties have **fourteen (14) days** from service of this Report and

2    Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6;

3    FRCP 72(b). Failure to file objections will result in a waiver of those objections for

4    purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating this time

5    limitation, this matter shall be set for consideration on **March 13, 2020**, as noted in the

6    caption.

7    Dated this 28th day of February, 2020.

8

9

10    Theresa L. Fricke
      United States Magistrate Judge