UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAMES ANTHONY WILLIAMS,

                    Plaintiff,

        v.

STEPHEN SINCLAIR, et al.,

                    Defendants.

Case No. 3:19-cv-05045-DGE-TLF

REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 182), AND ORDER STRIKING PLAINTIFF'S MOTION FOR EXTENSION OF TIME (DKT. 198)

Noted for January 26, 2024

        This matter is before the Court on defendants' motion for summary judgment (Dkt. 182) and plaintiff's motion for leave to file a late pleading (Dkt. 198).

        Plaintiff is an inmate at the Washington Corrections Center (WCC). Plaintiff is unrepresented by counsel and has been granted *in forma pauperis* status. Dkt. 5. He brings Eighth Amendment challenges to: (1) his prolonged placement in solitary confinement/Maximum custody, and (2) the Department of Corrections' ("DOC's") Disruptive Hygiene Behavior Response Protocol (the "Protocol") -- procedures that would apply in a situation where an inmate intentionally smears any bodily fluid on their person or cell. Dkts. 123 and 14 at 3.

        Plaintiff's operative complaint names as defendants former senior DOC officials Stephen Sinclair (former DOC Secretary) and Timothy Thrasher (former DOC Mission

1    Housing Administrator (MHA)) in their personal and official capacities.[1] This matter has

2    been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v.*

3    *Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4).

4         For the reasons set forth below, plaintiff's motion for leave to file a late pleading

5    (Dkt. 198) is STRICKEN as unnecessary and moot.

6         The undersigned further recommends, for the reasons below, that the Court

7    GRANT defendants' motion for summary judgment (Dkt. 182). The Court should:

8         (1)  dismiss plaintiff's claims challenging his placement and retention in Max

9              custody with prejudice and,

10        (2) dismiss plaintiff's claims challenging the Disruptive Hygiene Behavior

11             Response Protocol without prejudice for failure to exhaust his administrative

12             remedies.

13                    I.    <u>RELEVANT FACTUAL AND PROCEDURAL HISTORY</u>

14   **A.    Background**

15        Plaintiff commenced this action in January 2019.[2] Dkt. 1. In May 2019,

16   defendants brought a pre-discovery motion for summary judgment. Dkt. 13. On

17   February 28, 2020, this Court issued a Report and Recommendation recommending

18   that plaintiff's official-capacity claims asserting a facial challenge to the Protocol be

19   dismissed. Dkt. 27 at 16. This Court further recommended that plaintiff should be

20   permitted to amend his complaint to state personal-capacity supervisory liability claims

---

[1] The Court notes that at the time plaintiff filed his complaint these defendants were still in these official roles with DOC.

[2] The Court notes that plaintiff's original complaint only brought challenges to the Protocol; plaintiff first included challenges to his prolonged placement in solitary confinement in his First Amended Complaint. *See* Dkts. 6, 27, 30, 47.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 2

1  against the defendants, and to name and assert personal-capacity claims against

2  unnamed "John Doe" prison staff for incidents of misuse of the Protocol that had been

3  alleged in plaintiff's original complaint. *Id*. at 18, 20.

4      In June 2020, the Hon. Benjamin H. Settle issued an Order adopting the Report

5  and Recommendation in part. Dkt. 30. The Order dismissed plaintiff's official-capacity

6  facial attack claims only as to the withholding of a single meal under the Protocol and

7  denied defendants' motion without prejudice as to all other aspects of plaintiff's claims.

8  *Id*. at 4. The Order permitted plaintiff to file an amended complaint to clarify his claims

9  and suggested that plaintiff would benefit from the assistance of counsel in drafting an

10  amended complaint. *Id*. at 5.

11      Plaintiff was subsequently appointed *pro bono* counsel; an amended complaint

12  was filed in January 2021. Dkts. 35, 47. In May 2021, both of plaintiff's counsel filed

13  motions for relief from the order appointing them, citing incompatibility and a dispute

14  over case strategy. Dkts. 53, 55. The Court granted the motions, and plaintiff therefore

15  is unrepresented by counsel in this matter. Dkt. 56.

16      In September 2021, plaintiff moved for leave to file a proposed second and

17  potentially a future third amended complaint. Dkt. 87. In February 2022, defendants filed

18  a second motion for summary judgment. Dkt. 103.

19      The Court denied plaintiff's motion to file the proposed second amended

20  complaint but allowed plaintiff to file a further motion to amend -- to include a complete

21  proposed amended complaint and comply with the guidelines in the February 28, 2020,

22  Report and Recommendation. Dkts. 100, 115. In April 2022, plaintiff moved for leave to

23  file a third amended complaint. Dkt. 118. In August 2022, the Court granted plaintiff's

24

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 3

1  motion for leave to file the third amended complaint and denied defendants' second

2  motion for summary judgment without prejudice as moot. Dkt. 122.

3  **B.    Operative Complaint**

4      In his Third Amended Complaint – which is the operative complaint -- plaintiff

5  alleges defendants violated his Eighth Amendment rights in two ways. Dkt. 123.

6      **First** -- Count I alleges defendants violated his Eighth Amendment rights by

7  forcing him to live in solitary confinement despite his mental illness, and that solitary

8  confinement has exacerbated his mental illness. *Id.* at 4-19. Plaintiff alleges he was first

9  hospitalized for mental illness when he was 10 years old and has been diagnosed with

10  mental illnesses during his life, including many diagnoses by DOC mental health

11  professionals; plaintiff asserts that he has been diagnosed with schizophrenia, multiple

12  personality disorder, autism spectrum disorder, antisocial personality disorder, attention

13  hyperactivity disorder, unspecified psychosis, bipolar disorder, psychopathy, narcissistic

14  personality disorder, schizophrenic disorders, schizoaffective type, affective psychoses,

15  "recur manic dis-moj", "recur manic – sev w psycho", "depress psychosis -unspec",

16  bipolar affective, manic, "bipolar I manic-sev w psy", bipolar affective mixed, bipolar

17  disorder NOS, OTH nonorganic psychoses, autistic disorder – current. *Id.* Plaintiff also

18  indicates he has been diagnosed with epilepsy. *Id.*

19      Plaintiff asserts that from 2011 to 2015 DOC medical provider Dr. Ryan Quirk

20  was his "personal psychologist." *Id.* Plaintiff indicates that for three and a half years Dr.

21

22

23

24

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 4

1    Quirk forced him to take involuntary antipsychotic medication[3] on the basis that he had

2    "bipolar I disorder, sever, most recent episode manic with psychotic features." *Id.*

3         Plaintiff contends there is "general consensus nationwide among published

4    research psychiatrist and psychologist that prolonged solitary confinement will cause

5    severe and permanent damage to the minds and emotions of the mentally ill" regardless

6    of the mental illness type. *Id.* Plaintiff contends "the damage is so severe that it actually

7    causes permanent physical damage to the limbic system of the brain (it is permanently

8    enlarged) and the prefrontal cortex (it becomes smaller from dying brain cells) and the

9    adrenaline glands (on a metabolic level they forever produce more adrenaline – and

10   produce it faster than normal too)." *Id.* Plaintiff contends the general consensus among

11   published research psychiatrist and psychologist" is that solitary confinement causes

12   the most severe permanent damage to the brain mind and emotions of those with

13   psychopathy, personality disorders, sedating medications, attention deficit hyperactivity

14   disorder and antisocial personality disorder. *Id.* Plaintiff cites to a 2006 article in the

15   Washington University Journal of Law & Policy titled "Psychiatric Effects of Solitary

16   Confinement" by Dr. Stuart Grassian, which he includes as an attachment to his Third

17   Amended Complaint, as the basis for these assertions. *Id.*

18        Plaintiff contends he has been "diagnosed with all the mental illnesses and other

19   conditions that Dr. Grassian says predisposes one to suffer severe and permanent

20   brain, mind and emotional damage and physical damage – (cutting myself) that is more

21   severe than the damage solitary confinement causes to one who has psychosis

---

[3] *See Williams v. Gage*, No. C14-453 MJP, Dkts. 56, 61 (Hon. Marsha J. Pechman granted a defense motion for summary judgment on plaintiff's previous lawsuit concerning involuntary medication).

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 5

1    (although I have psychosis too)." *Id.* Specifically, plaintiff points to the diagnoses of

2    antisocial personality disorder, attention deficit hyperactivity disorder, psychopathy, and

3    epilepsy. *Id.*

4        Plaintiff alleges, as a result of having these mental illnesses and being forced to

5    live in solitary confinement, he has cut himself, stating that, for example he received 4

6    sutures on October 31, 2017, 6 sutures on March 1, 2018, 2 sutures on January 18,

7    2018, etc. *Id.* He also indicates he's attempted suicide numerous times. *Id.* He alleges

8    this "toxic combination" causes him to tear up prison property, smear feces, pee out his

9    door onto the hall floor, verbally abuse staff with derogatory demeaning statements, and

10   racial epithets, and sexual harassment, threaten staff, and occasionally assault staff. *Id.*

11   He alleges this behavior is "semi-volitional" which he defines as having "control over

12   your body but not your emotionally distraught and desperate angry enraged at times

13   mind." *Id.* Plaintiff contends that DOC Dr. Karie Rainer admits plaintiff's actions can be

14   "semi-volitional." *Id.* (citing Dkt. 124 at 5).

15       Plaintiff contends "Dr. Grassian and Dr. Hancy, two leading experts in the effects

16   of solitary confinement on the mentally ill also say that the feces smearing, threats,

17   assaults, destruction of state property, etc. are semi-volitional." *Id.*

18       Plaintiff states he is suing defendants Sinclair and Thrasher in their official and

19   individual capacities for forcing him to live in solitary confinement for the last 13 years.

20   *Id.* He alleges both defendants,

21       are fully aware of the permanent damage [he] has suffered as a result of [his] 13
         years in solitary confinement. Even though they knew all along that the solitary

22       confinement was exacerbating [his] mental illness to the point it was causing
         [him] to smear feces, cut [himself], and assault staff – they have continued to

23       maliciously force [him] to live in solitary confinement because they believe that to
         release [him] from solitary confinement would be a de facto admission that long-

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 6

term solitary confinement in the State of Washington causes mentally ill inmates to suffer permanent mental harm.

*Id.*

**Second** -- Count II alleges that solitary confinement exacerbates plaintiff's mental illness to the point that he smears feces, and that DOC prison staff violate the Eighth Amendment by denying him multiple meals in a row when he smears feces. *Id.* at 20-23.

Plaintiff alleges DOC's "Disruptive Hygiene Behavior Response Protocol" allows prison staff to deny an inmate one meal if he smears feces but must feed him the second meal. *Id.* But plaintiff alleges prison staff routinely violate the policy by documenting in writing that they have denied him only one meal – but then they will violate the policy by also denying him the second, third, fourth, and fifth, even sixth meal and sometimes seventh meal in a row. *Id.* Plaintiff alleges the policy is unconstitutional because "it has no protocol [written] into it that would prevent DOC staff from abusing it in the manner of denying more than one meal." *Id.* Plaintiff alleges he has been denied hundreds of meals over a 3-year period resulting in rapid weight loss. *Id.*

For Count I plaintiff seeks $20 million in damages and $10 million in punitive awards, and to be released from solitary confinement permanently. *Id.* For Count II, plaintiff seeks "some type of injunctive relief that would ensure prison staff cannot violate the Disruptive Hygiene Behavior Response Protocol by denying an inmate more than one meal." *Id.*

Defendants move for summary judgment on the grounds that plaintiff fails to establish a constitutional violation, that they are entitled to qualified immunity with respect to his solitary confinement/Maximum custody claim, that plaintiff failed to

1  exhaust his administrative remedies with respect to his Protocol claim, and that plaintiff

2  fails to show a viable claim for injunctive relief. Dkt.182.

3      Plaintiff has filed a response to the motion (Dkt. 199) as well as a motion for

4  leave to file a late pleading requesting that his response be considered in deciding

5  defendants' summary judgment motion (Dkt. 198). Defendants have filed a reply to the

6  motion for summary judgment. Dkt. 201.

7              II.    <u>DISCUSSION</u>

8  **A.    Motion for Leave to File Late Pleading**

9      By order dated July 19, 2023, the Court extended plaintiff's deadline to file his

10  response to defendants' motion for summary judgment to August 14, 2023. Dkt. 196.

11  Plaintiff filed his response to defendants' motion for summary judgment on August 1,

12  2023. Dkt. 199. On that same date plaintiff filed a motion for leave to file a late pleading

13  requesting that his response to defendants' motion for summary judgment be

14  considered in deciding defendants' summary judgment motion. Dkt. 198.

15      Because plaintiff's response to defendants' motion for summary judgment was

16  filed timely under the previously extended briefing schedule for that motion, plaintiff's

17  motion for leave to file a late pleading (Dkt. 198) **is stricken** as unnecessary and

18  plaintiff's response has been considered in preparing this Report and Recommendation.

19  **B.    Defendants' Motion for Summary Judgment**

20      **1.    Solitary Confinement Claim**

21          **a)  Evidence**

22      In support of their motion for summary judgment, defendants submit evidence of

23  the following. Plaintiff has filed a declaration in response to plaintiff's motion as well as

24

25  REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 8

1  other evidence primarily in the form of medical and other DOC records. Dkt. 199.

2  Plaintiff's specific arguments and evidence presented in response to defendants' motion

3  will be discussed specifically in the Court's analysis below.

4         *i.*   *DOC's Max Custody Policy*

5       The DOC's highest custody level is known as Maximum (Max) Custody. Dkt. 183

6  (Decl. of Kevin Bowen) at 2. DOC Policy 320.250 outlines when and how someone can

7  be placed on Max custody. *Id.* To initiate a placement in Max custody, first a custody

8  facility plan will be generated by classification staff at the facility recommending that an

9  individual's custody level should be reviewed at that time. *Id.*

10       This occurs when staff in the facility have observed behaviors that are not

11  manageable in general population. *Id.* This step involves a number of individuals --

12  including the incarcerated individual, assigned classification counselor, unit supervisor,

13  a representative from custody staff – and, frequently, other interested parties. *Id.* Any

14  recommendation will be submitted to the correctional program manager and then

15  reviewed and either approved or denied by the facility superintendent or their designee.

16  *Id.*

17       Individuals housed in "IMUs" (Max custody) require a heightened degree of

18  security and supervision. Dkt. 104 (Second Decl. of Timothy Thrasher) at 2. This

19  population includes individuals with chronic behavioral problems, who pose a serious

20  threat to the safety of staff or fellow incarcerated individuals through a pattern of violent

21  or seriously disruptive behavior, who are considered an escape risk, or who have

22  extreme protection needs. *Id.*

23

24

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 9

1     Before a decision is made regarding any individual who is recommended for

2  assignment to Max custody, a Correctional Specialist 4 located in the Headquarters

3  classification unit reviews all Max custody recommendations. *Id.* The Correctional

4  Specialist 4 conducts a review that includes, but is not limited to, the following items: the

5  individual's file including other instances where they were assigned to Max custody,

6  infraction record, medical and mental health codes/concerns, facility staff

7  recommendation, and the individual's input. The Correctional Specialist 4 then presents

8  their recommendation and the facility's recommendation to the DOC Headquarters (HQ)

9  Maximum (MAX) Custody Committee where a final decision is made. *Id.*

10     The Max Custody Committee consists of representatives from the following

11  disciplines: custody, classification, mental health, special investigative services,

12  substance abuse and recovery unit, and cognitive behavioral intervention unit. Dkt. 183

13  (Bowen Decl.) at 2. The intent is for a number of perspectives to be presented when

14  considering whether Max custody is appropriate for a particular individual. *Id.* After a

15  vote, and approval for Max custody, the Max Custody Committee identifies expectations

16  for the individual while they are housed in Max custody and any programming or other

17  needs the person may have that would be necessary for them to leave Max. *Id.* (Bowen

18  Decl.) at 2-3.

19     The Max Custody Committee also considers the individual's eligibility to progress

20  through levels based on the reason the individual was referred to Max custody. *Id.* The

21  policy allows for the development of a behavior and programming plan (BPP) or

22  individual behavior management plan (IBMP) specific to the individual to work towards

23  reinforcing positive, effective behaviors. *Id.* An IBMP may be developed to support

24

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 10

1    mental health needs. Dkt. 104 (Second Thrasher Decl.) at 3. DOC requires individuals

2    assigned to Max custody to participate in various programs/behavioral programs before

3    they are promoted to less restrictive conditions. *Id.* at 2. Programs are facilitated by

4    DOC staff, and they address pro-social thinking, alternatives to violence, education,

5    mental health interventions, substance abuse and other need areas common for

6    individuals assigned to Max custody prior to being suitable for promotion to a less

7    restrictive custody score and housing assignment. *Id.* Individuals on Max custody may

8    also have programming and activities in a congregate classroom and other out-of-cell

9    opportunities consistent with reasonable safety and security practices. Dkt. 183 (Bowen

10   Decl.) at 3. Each of these intermediary steps are designed to assist an individual to

11   develop skills or incentivize behavior that would allow them to progress out of Max

12   custody. *Id.*

13        There are opportunities for review and progression to a less restrictive

14   environment. *Id.* at 4. Individuals participate in a level system where they can earn

15   levels based on their behavior and can also be demoted to a lower level based on

16   negative behavior. *Id.* (Bowen Decl.). When an individual attains a higher level, they

17   obtain increased privileges. *Id.* In the IMU the highest level is 4 and the lowest level is 1.

18   Dkt. 104 (Second Thrasher Decl.) at 3.

19        While reaching the goals developed in the plan(s) assists the Max Custody

20   Committee in their review of the individual's housing placement, they do not serve as a

21   guarantee of release from Max custody. *Id.* Other factors, including the safety of the

22   individual, other incarcerated individuals, and staff, are also determinative of the

23

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 11

1    committee's decision on whether to retain the individual in Maximum custody housing.

2    *Id.*

3           It is the goal of DOC to allow inmates to work on progressive movement to less

4    restrictive custody. Dkt. 183 (Bowen Decl.) at 4. Formal classification reviews are

5    conducted at least every 180 days. *Id.* at 3. During these formal reviews the individual's

6    adjustment and progress in meeting the specific criteria in his BPP or IBMP is discussed

7    and documented in the custody facility plan. *Id.* The formal review provides an official

8    status update to the MDT that originally approved Max custody. *Id.* Formal classification

9    reviews may be conducted at any time if, for example, the goals are met or a change in

10   circumstance occurs. *Id.*

11          Informal classification reviews must be held at least every 60 days. *Id.* The

12   informal reviews are intended to engage the individual in efforts to meet the

13   expectations identified by the formal Max custody MDT. *Id.* The primary goal of informal

14   review is to provide feedback to the incarcerated individual regarding their progress and

15   address any needs so they can meet their expectations. *Id.* at 4.

16          The DOC reduced Max custody by 40% in 2021-2022. *Id.* (Bowen Decl.). In early

17   June 2023, the DOC initiated its restrictive housing transformation project, the objective

18   of which is to "Develop a plan representing a comprehensive pathway to effectively

19   eliminate 90% of solitary confinement within the next five years[.]" *Id.*

20          The DOC has hired private contractors to develop plans for change management

21   and project management. *Id.* Although not fully funded, the DOC is taking steps such as

22   creating and employing AMEND resource teams to at least one facility which provide

23

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 12

one-on-one services to individuals in Max custody and provide quality out of cell time including playing games, drinking coffee and basic dialogue. *Id.* at 4-5.

During the past year the DOC also increased its resources in restricted housing units at WSP-IMU allowing for an increase in out-of-cell time from one to three hours. *Id.* The DOC also hired Dr. Ryan Quirk as head of Forensic Psychology to assist in assessing risk and considering alternative options for individuals on Max custody. *Id.* The DOC has also developed progression pods to act as a diversion from Max custody or a promotion from Max custody, but only one of these progression pods has been launched and is focused on individuals who have refused to leave Max custody, not individuals who are safety or behavioral management concerns. *Id.*

ii.    *Plaintiff's Classification History*

Plaintiff has been incarcerated on his current sentence related to a murder conviction since May 28, 2009.[4] Dkt. 104 (Second Thrasher Decl.) at 3. On June 8, 2009, an initial classification assignment recommendation was issued that plaintiff be placed on close custody with mental health treatment. *Id.* The record shows that plaintiff first engaged in feces smearing, under his current sentence, on June 17, 2009. Dkt. 106 First Decl. of Dr. Ryan Quirk, (Appendix 1) at 7.

On July 28, 2009, a Custody Facility Plan (CFP) was initiated by facility staff. Dkt. 104 (Second Thrasher Decl.) at 21 and Exs. 84, 85. The CFP noted that plaintiff was being recommended for Max custody due to his history of violent behavior. *Id.* The CFP further noted that plaintiff had been found guilty of infractions for assaulting staff,

---

[4] Plaintiff was previously incarcerated with DOC from 1995 to 2006. Dkt. 106, First Decl. of Dr. Ryan Quirk (Appendix 1) at 7.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 13

1   tampering with lock/security device and threatening. *Id*. He was expected to achieve six

2   months infraction free behavior and complete an 11-step Program. *Id*.

3       A review was done on September 16, 2009, and DOC records indicate that

4   plaintiff received 16 major infractions in a two-month period and was on disciplinary

5   segregation due to those behaviors. *Id*. It was authorized for plaintiff to be placed into

6   administrative segregation as a danger to others and for the safety and security of the

7   institution. *Id*. It was recommended that he continue to work with mental health staff and

8   participate in his PRP (his congregate programming.) *Id*. The review further noted that

9   he had been smearing feces, threatening, covering his window and being disruptive. *Id*.

10  He adamantly opposed medications and was on involuntary medications. *Id*.

11      On March 11, 2010, another review was done. *Id*. at 21, and Ex. 86. DOC

12  records indicate that it was recommended that plaintiff remain in Max custody due to his

13  behaviors. *Id*. That plan noted that he continued to threaten staff and other offenders.

14  *Id*. During the review, plaintiff became derogatory in his comments towards the hearing

15  officer, and the review was terminated. *Id*.

16      On August 26, 2010, a review again recommended continued placement for

17  plaintiff in Max custody due to his aggressive and dangerous behaviors. *Id*. (Second

18  Thrasher Decl.) at 22, and Ex. 87. Due to his serious mental health issues, Williams

19  was retained at MCC-SOU and encouraged to complete his program. *Id*.

20      At his January 5, 2011, review, DOC records show that it was recommended that

21  plaintiff be transferred to Washington State Penitentiary (WSP) IMU. *Id*. at 21, and Ex.

22  88. He continued to exhibit extreme negative behavior, and he had received 31 serious

23  infractions between the dates of September 8, 2010, and January 2, 2011, for

24

25  REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 14

threatening and assaulting staff, smearing feces, flooding, sexual harassment, and tampering with lock/security device. *Id.* at 22, and Ex. 88.

Records from the June 23, 2011, review show that plaintiff had been transferred to WSP-IMU on January 12, 2011, and returned to MCC-SOU on June 2, 2011, and was infraction-free from that date to the date of the CFP; he appeared to be doing well. *Id.* at 22, and Ex. 89. It was recommended that plaintiff be maintained in maximum custody and work with mental health staff and participate in the PRP. *Id.*

The June 20, 2012, CFP states that plaintiff had been found guilty of 36 serious infractions during this review period, though he had not had any between April 15, 2012, and June 20, 2012. *Id.* at 22, and Ex. 90. Plaintiff was on step 1 of his program, meaning that he was on the lowest level due to his behavior, and it was recommended that he remain on intensive treatment status (ITS) in Max custody. *Id.*

At the January 3, 2013, review, DOC records note that plaintiff had been participating in his program for the past 3 months. *Id.* at 22, and Ex. 91. He was enrolled in Social Skills classes, as well as Understanding and Coping with Anger. *Id.* He was encouraged to continue positive participation with his program, and it was recommended that he remain on ITS in Max custody, "take advantage of isolation breaks with time out of cell. Isolation buy back is in effect based on this offender's infraction record. When he has 0 isolation owed, a recommendation of release from ITS will be forwarded." *Id.* (Second Thrasher Decl.).

On the July 11, 2013, CFP, it was noted that Williams' short period of positive behavior declined in this review period, with an "extreme increase" in infraction

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 15

behavior. *Id.* at 23, and Ex. 92. "From April of 2012 to May of 2013 he was infraction-free and achieved release from ISO status. *Id.*

DOC records indicate that beginning in May of 2013 "Williams has incurred seven serious and two general infractions that include staff assault." *Id.* It was recommended that he continue ITS with maximum custody and encourage completion of ITU program. *Id.*

The January 22, 2014, review record notes that Williams was on step 2 of 7 on his PRP program, but continued threatening behavior towards staff. *Id.* at 23, and Ex. 93. "Offender Williams is making no attempt to program while in the ITS program and continues to cause disruption to the operations of the unit." *Id.* It was recommended that he continue ITS with Max custody. *Id.*

On July 11, 2014, another review states that plaintiff's serious infraction behavior continues, with 30 serious infractions during the review period. *Id.* at 23, and Ex. 94. He "continues to be a detriment to the other offenders that he is housed around and the PRP program as a whole. *Id.* Offender Williams' need for attention at any cost from staff interferes with operations consistently and results in loss of quantity and quality of services within the Mental Health Disciple of the ITU setting…[His] consistent need for medication management and behavior intervention makes placement opportunities outside MCC/SOU difficult." *Id.* (Second Thrasher Decl.). Plaintiff claims that being on involuntary medication has turned him into a "psychopathic killer and that he is always planning, thinking about ways to kill people." *Id.* It was recommended he remain on ITS with Max custody. *Id.*

1    The January 13, 2015, review record notes another infraction for assaulting staff

2 and continued extremely disruptive behavior which has "impeded his ability to come out

3 of his cell." *Id.* at 23, and Ex. 95. The CFP also noted that "the throw shield remains up

4 on his cell door due to multiple threats/incidents of throwing on staff." *Id.* It is

5 recommended he remain on Max custody. *Id.*

6    On July 2, 2015, the review records note that, "due to his recent infraction and

7 ongoing disruptive behavior, Williams was suspended from groups." *Id.* at 24, and Ex.

8 96. "He has threatened to hurt staff and himself." *Id.* He "actively threatens staff,

9 attempts to harm them by throwing substances out of his cell, engages in verbal abuse."

10 *Id.* He has received 25 infractions during this review period. *Id.* It is recommended he

11 remain on ITS with Max custody. *Id.*

12    DOC records show that on October 14, 2015, it was decided that since plaintiff

13 had made no progress in the ITS program and had been disruptive to the milieu in

14 general and had reportedly been "a particularly provocative individual toward one or

15 more offenders," that he be released from ITS and transferred to another Max facility.

16 *Id.* at 24, and Ex. 97. The decision was made to transfer Williams to WSP and retain

17 him on Max custody. *Id.*

18    Records from the January 6, 2016, review show that Williams said he wanted a

19 job in the IMU, and if he had a job, he would not spread feces or file lawsuits. *Id.*

20 (Second Thrasher Decl.) at 24, and Ex. 98. The recommendation was to retain Max

21 custody pending completion of all IMS expectations or presentation of evidence there is

22 no longer a threat in a general population setting. *Id.* Williams had seven infractions in

23 January alone and has refused to participate in programs. *Id.*

24

25 REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 17

1    The August 9, 2016, review noted that Williams had received "an unprecedented

2    number of infractions while housed at WSP." *Id.* at 24, and Ex. 99. The Review

3    Committee recommended he be retained at WSP on Max custody. *Id.*

4    On March 8, 2017, another review was conducted which noted that since his

5    arrival at WSP on 11/23/15, he had been found guilty of 66 serious infractions. *Id.* at 24-

6    25, and Ex. 100. Records showed he assaulted a nurse by spitting in her face and

7    threatens staff on a daily basis. *Id.* The CFP noted: "Williams is currently housed on the

8    mental health tier in the hospital. *Id.* He was moved there after a recent spontaneous

9    use of force. *Id.* Prior to that he smeared feces on the walls of his cell and refused

10   directives to remove it. *Id.* Williams uses these behaviors to negotiate and bargain for

11   more food/property/privileges. This is his baseline." *Id.* It was recommended Williams be

12   retained on Max custody and transferred to MCC-SOU. *Id.*

13   On March 29, 2017, records show that plaintiff was transferred from WSP to

14   Stafford Creek Correctional Center (SCCC) and an on April 28, 2017, an intake review

15   was done. *Id.* at 25, and Ex. 101. It notes that Williams "has been in prison for murder

16   since 2009. He has been in the IMU the entire time…He has not put forth meaningful

17   effort in working with mental health staff nor has he engaged in programming.

18   Numerous approaches and interventions have been attempted with Williams, whose

19   resistance, volatility, propensity to disturb others and threatening/aggressive behaviors

20   continue despite. He has 532 infractions." *Id.* (Second Thrasher Decl.). It is

21   recommended to maintain Max custody. *Id.*

22   DOC records show that on August 16, 2017, it was recommended (after review)

23   that plaintiff should be transferred out of SCCC to either WSP or MCC. *Id.* at 25, and

24

25   REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 18

Ex. 102. It was noted that in 4 ½ months, Williams incurred 42 infractions. *Id.* As of August 2017, he had incurred 537 serious infractions and had been referred for Persistent Prison Misbehavior numerous times. *Id.* All members of the Review Committee agreed he should remain on Max custody and be transferred to a "suitable facility." *Id.*

Plaintiff was transferred to MCC-IMU and on January 30, 2018, was reviewed again. *Id.* at 25, and Ex. 103. The CFP noted that he had received 19 serious infractions and 60 negative behavior observations since his arrival on September 20, 2017. *Id.* It was recommended that his case should be referred to the Headquarters Max Custody Committee and that he should remain in Max custody and be transferred to another IMU. *Id.*

Records from the May 16, 2018, hearing show Counselor Saunders noted, "Williams refused to sign or acknowledge anything I said regarding this hearing. He stated he would need lots of time so he could prepare a legal brief. He then began a barrage of disrespectable comments towards myself." *Id.* at 26, and Ex. 104. It was again recommended that plaintiff should be transferred to another facility but to maintain Max custody. *Id.* (Second Thrasher Decl.). He had refused any attempt made by staff to help him improve his behavior. *Id.*

DOC asserts that plaintiff was transferred to the Washington Corrections Center (WCC) at Shelton. *Id.* at 26, and Ex. 105. The July 30, 2018, review notes indicate plaintiff's behavior had been difficult, with 13 serious infractions and 402 behavior log entries since his last review period. *Id.* He had not engaged in programming, and it was recommended he should remain in Max custody and transfer to another facility. *Id.*

Records show that plaintiff was then transferred back to WSP and another review was done on November 30, 2018. *Id.* at 26, and Ex. 106. Counselor David McKinney noted that plaintiff had made no progress toward completing DOC's Max custody expectations. *Id.* He also noted that plaintiff had behavioral problems within IMU North and had three serious infractions pending. *Id.* "Williams has been found guilty of 30+ serious infractions in 2018. Due to his MH and behavioral issues the best we can hope to do is maintain him in IMU. I recommend no change of status at this time. I believe offender Williams is dangerous and will harm others if given the opportunity." *Id.*

According to DOC records, on April 24, 2019, plaintiff 's situation was again reviewed, and he was approved for transfer to MCC-ITU. *Id.* at 26 and Ex. 107. DOC recommended he should be retained on Max custody due to "long-term and continuing behavior issues." *Id.*

Records show that by June 13, 2019, plaintiff was back at MCC; he told the Review Team that he wanted to start a program where he could get magazines and picture books. *Id.* at 27, and Ex. 108. "I need something to stimulate my mind. I want to work toward getting a radio and staying out of trouble." *Id.* DOC records show plaintiff refused to attend his MDT meeting on the scheduled date. *Id.* (Second Thrasher Decl.).

Plaintiff was placed on Conditions of Confinement along with security enhancements for disruptive and threatening behaviors. *Id.* The throw shield remained up on his cell door due to multiple threats/incidents of throwing on staff. *Id.* It was suggested he take advantage of additional programming opportunities as they become available while in the ITU in order to gain knowledge and tools to help him transition back into general population. *Id.* "He does not want to participate in RGCT pathway." *Id.*

It was recommended by DOC that plaintiff should be retained on Max custody in the ITS program. *Id.* at 27, and Ex. 108.

In the February 11, 2020, CFP, Counselor Sonia Mills noted that plaintiff had broken multiple phones and continued to state that he would destroy state property if his demands were not met. *Id.* at 27, and Ex. 109. "During the cell front meetings Williams was oppositional, combative and antagonistic. Communication with him becomes mostly one-sided, when he speaks over me focuses on why he is the way he is, who he can blame for the situation he is in (other than himself.)" *Id.* She recommended discharge out of ITS, maintain Max custody and assign an appropriate placement. *Id.* Plaintiff was discharged from RTU Level of Care by the Mental Health Teleconference. *Id.* Records from DOC note that he presented a significant management challenge and had been resistant to participation in treatment and programming. *Id.* His case was forwarded to the Max Custody Committee for housing review and assignment to an appropriate facility. *Id.*

In the March 23, 2021, review meeting records, it is noted that plaintiff had remained infraction free since January 2021, is a level 3, is programming and working as a shower porter. *Id.* (Second Thrasher Decl.) at 27, and Ex. 110. "Williams has not completed his expectations but is very close and will require an exit strategy." *Id.* It was recommended he remain on Max custody until all expectations have been completed. *Id.*

The September 16, 2021, review record notes that Williams had satisfactorily completed CBCP (Cognitive Behavior Change Program) on 4/16/2021. *Id.* at 28, and Ex. 111. He was assigned at first as a shower porter, and later a tier porter. *Id.*

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 21

1    Counselor Justin Brown writes, "He had an extended period of time without

2    demonstrating feces smearing behavior. Williams was unassigned from his job on

3    4/17/2021 due to refusing to participate in work duties. His participation with MH has

4    become irregular and unpredictable. In the last month's time, Williams has restarted his

5    feces smearing behavior and assaulted an officer by throwing a bar of soap at and

6    spitting upon him. He has also caused substantial damage to a cell by breaking off a

7    shelf in the cell and using it to break out a window." *Id.* at 28, and Ex. 111. It was

8    recommended that plaintiff should remain in Max custody and transfer to an appropriate

9    facility. *Id.*

10        Steven Sundberg noted, "WSP has had some limited success with this individual

11    recently. However, he has become very staff intensive, reverting back to old behaviors,

12    requiring the unit procedures to be placed on pause, on a daily basis, while Williams'

13    negative behavior (staff assault, threatening, throwing, safety/sanitation) is addressed.

14    This individual has been at WSP for a year and it is time for him to move to another

15    facility where he may have a chance at successful programming and an eventual

16    release to a general population setting." *Id.* (Second Thrasher Decl.).

17        On October 20, 2021, another CFP was initiated due to plaintiff being moved

18    from WSP to MCC on October 11, 2021. Dkt. 183 (Bowen Decl.) at 7, and Ex. 4.

19    Plaintiff requested a radio and indicated he was going to put in for his Level 2 and TV.

20    *Id.* Staff noted plaintiff indicated he planned on doing what it takes to get out of Max

21    custody. *Id.* Plaintiff's behavior and programming plan noted that he had been infraction

22    free since September 27, 2021, was currently a Level 1 and received a radio on

23    October 20, 2021. *Id.* It stated plaintiff had been unable to promote due to ongoing

24

25    REPORT AND RECOMMENDATION ON
      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
      (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
      MOTION FOR EXTENSION OF TIME (DKT. 198) - 22

disciplinary issues mostly relating to violence towards staff or smearing feces. *Id.* During intake plaintiff indicated he would never leave Max custody. *Id.* It was recommended he remain in Max custody and participate in assigned programming. *Id.*

On March 30, 2022, a CFP was initiated noting plaintiff had received 7 infractions between September 15, 2021, and March 16, 2022, for threatening, assaulting staff, sexual harassment and indecent exposure. *Id.* at 8, and Ex. 5. The CFP states after stating he wanted to go the facility risk management team plaintiff told mental health staff "I wish you (sic) get cancer and die" and started banging on the door. *Id.* Plaintiff sent several kites the next day complaining about money being taken from his account and making threatening statements. *Id.* The plan states plaintiff had been serious infraction free since March 16, 2022, previously was a Level 1, but had recently achieved Level 3 and TV privileges for a short period. *Id.* It indicated plaintiff had an active IBMP and had showed a slight improvement in his feces smearing behavior but continued to be a behavioral management concern by threatening to harm staff and requires intense staff resources. *Id.* It was recommended plaintiff be maintained on Max custody at MCC/IMU. *Id.* (Bowen Decl.) at 8, and Ex. 5.

On April 5, 2023, a CFP was initiated. *Id.* It reflected plaintiff had received 19 serious infractions between July 5, 2022, and March 23, 2023, for staff assault, smearing feces, threatening, sexual harassment and tampering with a security devised. *Id.* at 8, and Ex. 6. Staff noted "All attempts to curb [plaintiff's] behavior have not worked. He has short periods of good behavior.["] The report indicates plaintiff tells staff he "doesn't like to go too long being good." *Id.* He had not completed the offender change program and staff requested he be moved so he can try another approach. *Id.*

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 23

1  Staff stated that "MCC-IMU has attempted to mitigate [plaintiff's] behavior through

2  IBMPs, but it does not appear that he is willing to engage in positive programming for

3  very long." *Id.* It was recommended to maintain in Max custody and transfer to another

4  IMU for programming. *Id.*

5         Defendants' evidence shows that throughout plaintiff's incarceration with DOC he

6  has received nearly 800 serious infractions for threatening and assaulting staff,

7  destroying property, and smearing feces. Dkt. 104 (Second Thrasher Decl.) at 4.

8                    *iii.    Declaration of Kevin Bowen*

9         Defendants present the declaration of current DOC Mission Housing

10 Administrator (MHA) Kevin Bowen.[5] Dkt. 183 (Bowen Decl.). Mr. Bowen states

11 that:

12         Ultimately, what is keeping Mr. Williams in MAX is his incessant behavior
        threatening significant harm to staff and the smearing of feces. Both of these
13       behaviors demonstrate a safety concern to both Mr. Williams and Department
        staff. Specific to the threats – Mr. Williams' threats are uniquely frequent and
14       especially graphic or personal in nature. Based on these threats (which include
        threats of sexual assault) and Mr. Williams's demonstrated significant history of
15       violence in the community, including an unprovoked murder of an unknown
        person, the Department has to take his threats seriously. Mr. Williams routinely
16       threatens to kill people and there is enough information based on his past
        violence that these threats cause me concern for the safety of staff and also
17       other incarcerated individuals were Mr. Williams to be promoted to a less
        restrictive setting. Even without the threats of violence, I have safety concerns
18       related to Mr. Williams' other behaviors. His smearing, destruction of unit
        property, frequent door kicking, flooding the tier, and berating staff would likely
19       not be accepted by the other incarcerated population. Promoting Mr. Williams to
        a less restrictive environment while he continues these behaviors would cause
20       me concern for Mr. Williams' safety as I could see this causing tension and
        potential physical altercations between incarcerated individuals. Beyond this,
21       these behaviors cause a significant disruption in the daily operation of the units,
        meaning these behaviors would interfere with the programming of others in the
22       unit. Ultimately, without the cessation or significant decrease of these violent
        threats, aggressive behaviors, and disruptive behaviors, I have significant
23       concerns about Mr. Williams ability to be safely promoted to a less restrictive
        setting. …

24 ─────────────────────────────
   [5] Mr. Bowen indicates he has been the DOC MHA since 2021.

25 REPORT AND RECOMMENDATION ON
   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
   MOTION FOR EXTENSION OF TIME (DKT. 198) - 24

> Mr. Williams has had opportunities to transition from Max Custody. Mr. Williams will also continue to have other opportunities to transition to a lower custody level.

*Id.* (Bowen Decl.) at 10-11.

> iv.    *Declaration of Timothy Thrasher*

Defendants present the declaration of former DOC MHA Timothy Thrasher, who is named as a defendant in this action.[6] Dkt. 104 (Second Thrasher Decl.). Mr. Thrasher states that:

> DOC records show that Williams has been in Max custody since September 23, 2009 due to his violent behaviors and constant graphic threats of physical harm and assault to Department staff. His behaviors make it unsafe for staff, other offenders and himself for him to be placed in general population.
> …
> DOC staff have worked tirelessly with Williams to promote him to a lower custody level as soon as his behavior is no longer threatening and he completes his identified expectations. He is dangerous and disrupts unit operations to the scale that it would make it unsafe for him and others in the unit. He refuses to work to promote in levels, he will not meet any expectations set for him and he continues to threaten staff.
> Williams has been informed on multiple occasions that he has the ability to be promoted to less restrictive custody levels, including possible custody promotion to general population, if he enters and successfully completes the programming identified in his custody facility plans and refrains from receiving infractions and being disruptive.

*Id.* at 21, 28-29.

> v.    *DOC Policy on Mental Health Services, DOC Health Plan*

Within DOC prisons, mental healthcare is provided in accordance with DOC Policy 630.500: Mental Health Services and the Washington DOC Health Plan (Health Plan). Dkt. 105 (Decl. of Karie Rainer) at 1-2, and Ex. 2. Under the Health Plan, all incarcerated individuals are to be screened for mental health needs upon admission into a DOC prison. *Id.* Incarcerated individuals identified during screening as potentially needing mental health services will undergo a Mental Health Appraisal. *Id.*

---

[6] Mr. Thrasher indicates he served as the MHA from 2013 to 2021. Dkt. 104 at 1.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 25

1    Outpatient mental health services are provided to incarcerated individuals at all

2  DOC facilities. *Id.* Services may include: assessment of mental health concerns;

3  development of a formal Treatment Plan; individual psychotherapy; group

4  psychotherapy; relapse prevention, recovery, rehabilitation, and habilitation services in

5  individual, group, classroom and other settings; medication and pharmacy services;

6  transition services targeted at preparing the individual for return to the community; and

7  release planning. *Id.*

8    DOC has two mental health residential treatment units (RTUs) for male

9  individuals. *Id.* The RTUs are for individuals with a significant mental disorder, the

10  symptoms of which result in serious impairment in adaptive functioning and may include

11  a safety risk for the individual and/or others. *Id.* These individuals are determined to be

12  unable to function in general population. *Id.* Admission to an RTU requires authorization

13  through the Mental Health Transfer Procedure and Mental Health Transfer Care Review

14  Committee (CRC) and qualifies an individual for services provided in that RTU. *Id.*

15  However, the nature and intensity of services is determined by mental health staff in

16  accordance with DOC policies and facility protocols. *Id.* RTU services include:

17  assessment of mental health concerns; development of a formal Treatment Plan;

18  individual psychotherapy; group psychotherapy; relapse prevention, recovery,

19  rehabilitation, and habilitation services in individual, group, classroom and other

20  settings; medication and pharmacy services; transition services targeted at preparing

21  the individual for return to the community; and release planning. *Id.* (Rainer Decl.) at 2-

22  3, and Ex. 2.

23

24

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 26

1    The Mental Health Transfer Procedure must be followed for transfers involving

2    an individual moving into or out of an RTU; an individual with PUHLES psychiatric code,

3    *i.e.* "S" code, of 3 or higher who is transferring from one DOC facility to another; or an

4    individual with an S code of 3 or higher who is transferring between Intensive

5    Management Units (IMUs). *Id.* For transfer into or out of an RTU, the primary mental

6    health provider will complete a Form 13-465 and compile other relevant documentation.

7    *Id.* Every Tuesday, the MH Transfer Teleconference is held and attendees discuss the

8    list of referrals for that date. *Id.* Decisions about placement into or out of an RTU are

9    made by consensus when possible and by the committee chair when not. *Id.* The

10    decision at these MH Transfer Teleconference calls is whether an individual is in need

11    of RTU level of care. *Id.* If it is found that someone does not meet the criteria or

12    otherwise is not in need of the higher level of care provided by one of the two RTUs, the

13    MH Transfer Teleconference does not make a decision as to custody level or placement

14    elsewhere in the Department's system. *Id.*

15                    *vi.    Declaration of Karie Rainer*

16    Defendants present the declaration of DOC Mental Health Director Karie

17    Rainer. Dkt. 105 (Rainer Decl.). Dr. Rainer states:

18            I am familiar with James Williams …. I have not personally examined or
        evaluated Williams for over a decade but I am familiar with his mental health file
19        and history within DOC custody. Williams is an individual with very complex
        mental health concerns. His current working diagnoses, as of May 11, 2021, are
20        Autism Spectrum Disorder and Antisocial Personality Disorder. Department
        records show that he has had a number of diagnoses over the years to include
21        antisocial personality disorder, attention deficit hyperactivity disorder, unspecified
        psychosis, bipolar and antisocial personality disorder, substance dependence,
22        schizophrenia and borderline personality disorder. Often for individuals with such
        diagnoses, and for Williams, there are some behaviors and issues that result
23        from the personality disorder, which can be more volitional, and other behaviors
        that are consistent with a serious mental illness. Personality disorders are
24        distinguished from other mental illnesses, such as psychosis, by a number of
        factors. Primarily, other mental illnesses tend to have a biological basis, whereas

25    REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 27

personality disorders more often develop based upon people's adverse life experiences that contribute to a problematic world view and patterns of interacting with their environment. Symptoms of mental illnesses can be treated using medication and therapy, sometimes to the point of remission. Symptoms of personality disorders can be managed through efforts to learn different ways to interact and manage oneself. This is typically through therapy. Medications can also be helpful to reduce the intensity of some symptoms, but they do not resolve the personality disorder.

Williams has been in and out of RTUs and a restrictive setting throughout his incarceration. Typically, placement in an RTU is appropriate where an individuals' problematic behavior is believed to be as a result of mental illness. Whereas, placement in restrictive housing such as an IMU is appropriate where an individual's disruptive behavior is believed to be related to problematic personality dynamics rather than caused by a mental illness. I recall that Williams' movement in and out of RTUs is related to his failure to meaningfully participate in mental health programming and avail himself to the services offered in the RTUs. At times, Williams's behavior also interferes with the progress of others in the RTUs.

Williams' incarceration has been mired with a number of behavioral issues. His most recent Individual Behavior Management Plan describes problem behaviors to include verbal/sexual harassment, threatening staff, covering window (which is a security risk), clogging toilets, smearing feces, and self-harm. This is consistent with my general understanding of his behaviors throughout his incarceration. When an individual engages in behaviors like this, staff attempt to meet the individual's safety needs while also not reinforcing the maladaptive behaviors. This may be demonstrated through conducting 15 or 30 minute checks, conducting nursing assessments, modifying Williams's access to destructive or harmful materials, and an overall attempt to implement the Individual Behavior Management Plan (IBMP) to follow clinical advice in not reinforcing the maladaptive behaviors.

It is the goal of DOC for Williams to transition to a general population setting. Williams has stated that he will never leave IMU. It is unclear if that statement was made out of fear of leaving a familiar environment, hopelessness that he would be able to accomplish anything different or for some other reason. In order to transition to a less restrictive environment, Williams needs to be safe around himself and others.

*Id.* (Rainer Decl.) at 3-5.

> vii.    *Declarations of Dr. Ryan Quirk*

Defendants present two declarations of clinical psychologist Ryan Quirk, Ph.D.

Dkt. 106, First Decl. of Dr. Ryan Quirk (Appendix 1) and Dkt. 185, Second Decl. of Ryan

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 28

1    Quirk (Appendix 2). [7] Dr. Quirk's declarations are summarized below, and the full

2    declarations are attached to this Report and Recommendation as appendices for ease

3    of access and reference by the District Judge. *See* Appendix 1, Dkt. 106 (First Quirk

4    Decl.) and Appendix 2, Dkt. 185 (Second Quirk Decl.), attached to this Report and

5    Recommendation.

6         In his declarations, Dr. Quirk states that feces smearing behavior is not common

7    in psychosis and/or mood disorders, and is, instead, most commonly observed in

8    individuals with developmental (autism, for example) and intellectual disorders

9    (dementia, for example); and that neither of these are present for plaintiff. Dkt. 106, First

10   Quirk Decl. (Appendix 1) at 2-3. He asserts that while feces smearing can be the result

11   of serious mental illness (psychotic and/or mood disorder), such external, disorganized

12   behavior is the result of, and consistent with, that individual's internal thought

13   disorganization and that behavior in that category also abates in response to treatment

14   (most commonly in the form of antipsychotic medications). *Id.* Dr. Quirk indicates that

15   individuals who engage in this behavior as a result of serious mental illness (psychotic

16

17   ───────────────

18   [7] Dr. Quirk was employed as a Psychologist with the Washington State Department of
     Corrections (DOC) from August 2009 to July 2017, where he provided mental health care to
     patients on Max custody and was involved with the direct treatment of plaintiff. *See* Appendix 1,

19   Dkt. 106 (First Quirk Decl.) at 1-2 and Appendix 2, Dkt. 185 (Second Quirk Decl.) at 1-3. At the
     time of Dr. Quirk's first declaration, dated January 26, 2022, he was employed as the

20   Psychiatric & Social Services Manager for King County Jail. *Id.* Dr. Quirk subsequently returned
     to DOC in April 2023 as Chief of Forensic Psychology and submitted a second declaration in

21   support of defendants' current motion for summary judgment. *Id.* In his first declaration, Dr.
     Quirk indicates that in his role as defense expert in the case, he reviewed plaintiff's DOC mental

22   health records, his infraction and incident reports, chronological entries and custody facility
     plans for the purpose of determining a mental health diagnosis and the nexus between plaintiff's

23   feces smearing behavior and serious mental illness (specifically symptoms of a psychotic and/or
     mood disorder). *Id.* In his second declaration, Dr. Quirk indicates he reviewed additional records

24   and conducted interviews with WCC-IMU custody and WCC mental health staff and IMU mental
     health staff. *Id.*

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 29

1  and/or mood disorder) frequently do not recall the behavior and frequently exhibit other

2  symptoms such as disorganized verbal behavior and delusions. *Id.*

3      Dr. Quirk opines that plaintiff's feces smearing behavior represents "a willful act;

4  deliberate and organized", is the result of his anger, desire for

5  vengeance/retribution/punishment, and/or desire for immediate attention, is a response

6  to an external event or stimulus, and/or is intended to intimidate staff and engage in

7  negative reinforcement, and does not have a nexus with a serious mental illness

8  (psychotic and/or mood disorder). *Id.*

9      Dr. Quirk cites to several statements by plaintiff and staff observations in the

10  record in which he opines plaintiff is smearing to punish staff for what he perceives to be

11  their transgressions and/or perception that he has been mistreated. Dkt. 106, First Quirk

12  Decl. (Appendix 1) at 3-5. Dr. Quirk also notes that plaintiff has demonstrated the ability

13  to clean his own cell after smearing feces and has reported to DOC mental health staff

14  on one occasion that he is not suicidal, never had thoughts of suicide, and that he was

15  instead engaging in manipulation. *Id.*

16      Dr. Quirk cites to a various DOC records, including treatment notes, in support of

17  his opinion, including a psychiatric progress note by Dr. Schneeweiss from January 9,

18  2018, stating:

19          [Plaintiff's] acting out behavior at present consist [sic] of utilizing feces
            and urine as a weapon directed at staff- so called 'shit bombing'- as an
20          expression of protest- throwing feces at the camera in his cell. This
            behavior is volitional, completely under his control, and is not a
21          manifestation of a psychotic or affective disorder. He is currently on no
            psychotropic medication. Such medications are unlikely to have a
22          beneficial effect on his behavior.

23  *Id.* at 6 (citing Ex. 13).

24

25  REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 30

Dr. Quirk also notes that it appears plaintiff's own body is generally devoid of feces which he would not expect if the feces smearing behavior was a result of a serious mental illness. *Id.* at 6. Dr. Quirk also notes there is evidence that plaintiff recalls his behaviors and often presents as calmer on the same day or day after smearing feces which would also not be expected if his smearing behavior were the product of a serious mental illness. *Id.*

Dr. Quirk also notes that during plaintiff's first incarceration, from 1995 to 2006, plaintiff was housed for an extended period in Max custody but "appears to have first engaged in feces smearing behavior (as measured by a guilty finding for an "884" serious infraction – "Urinating, defecating, or placing feces or urine in any location other than a toilet or authorized receptacle" (WAC 137-25-030)) on June 17, 2009." Dkt. 106, First Quirk Decl. (Appendix 1) at 7. Dr. Quirk indicates that if plaintiff's smearing behavior were the result of serious mental illness and the result of prolonged solitary confinement this behavior would also have been expected to occur during plaintiff's first incarceration. *Id.*

Dr. Quirk also notes that plaintiff's feces smearing behavior is also present, and consistent in terms of frequency, whether he is in IMUs (Max custody) or ITUs (with access to more intensive mental health treatment), and whether he is on involuntary antipsychotic medication or not taking antipsychotic medication. *Id.* at 7-8. Dr. Quirk notes that this would not be expected if plaintiff's feces smearing behavior were the result of a serious mental illness. *Id.* Dr. Quirk notes that at one point in 2015, while plaintiff was on involuntary antipsychotic medications, he and other treatment providers put plaintiff on a "medication holiday." *Id.* He notes that, in his opinion and that of other

1    mental health professionals at the time, plaintiff did not psychiatrically decompensate

2    when he was taken off of the antipsychotic medications. *Id.* He again notes that this

3    would also not be expected if plaintiff's feces smearing behavior were the result of a

4    serious mental illness. *Id.*

5        Dr. Quirk notes that his observation of plaintiff's behavior off of antipsychotic

6    medications called into question the presence of any psychotic/mood disorder and was

7    akin to the observations of Dr. Dean and Richie, described in their 4/14/2009 Forensic

8    Psychiatric Report, regarding plaintiff's competency, which stated:

9        …the defendant himself has provided additional clinical data that has
         allowed us to significantly alter the previous opinion; to whit, without
10        medications, he has demonstrated that although he is angry and has poor
         frustration tolerance, he can demonstrate complete and clear familiarity
11        with his legal situation and options and engage in goal-directed
         conversation, arguing most persistently on his own behalf without any
12        intrusion of 'delusional' content, for an extended period of time, *when he
         so chooses*. He prefers to speak along themes of how others are to
13        blame for his life circumstances, and to portray himself as a victim, but
         these stances and attitudes are consistent with his severe personality
14        pathology and do not present signs of a major mental illness such as
         schizophrenia.

15    Dkt. 106, First Quirk Decl. (Appendix 1) at 8-9.

16        Dr. Quirk states that it is his clinical opinion that plaintiff is in control of his

17    behavior. *Id.* He acknowledges that while there have been differing opinions over the

18    years regarding plaintiff's diagnostic picture, including by Dr. Quirk himself, "what

19    remains clear is that Williams has consistently demonstrated traits of psychopathy." *Id.*

20    He states that in reviewing some of plaintiff's statements that have been previously

21    viewed as representing evidence of grandiose delusions, "it is my clinical opinion that

22    some of these observations may actually be more representative of symptoms of

23    (301.81) Narcissistic Personality Disorder." *Id.*

24

25    REPORT AND RECOMMENDATION ON
      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
      (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
      MOTION FOR EXTENSION OF TIME (DKT. 198) - 32

1    Dr. Quirk states that, in his clinical opinion, "the combined presence of

2  psychopathic traits, Antisocial Personality Disorder and Narcissistic Personality Disorder

3  demonstrated by Williams has resulted in the challenges in managing him in an

4  institutional setting and the difficulty in safely transitioning him to a less restrictive

5  setting." *Id.* at 9-10.

6    Dr. Quirk opines that, as with plaintiff's feces smearing behavior, plaintiff's non-

7  compliant behavior and threats and acts of violence also have no nexus to a serious

8  mental illness (psychotic and/or mood disorder). *Id.* Dr. Quirk notes that as with feces

9  smearing, plaintiff's threats and acts of violence have been present across time over the

10  course of his current incarceration, whether he has been in residential treatment (SOU-

11  ITU) or non-psychiatric housing (IMU), and whether or not he has been prescribed

12  antipsychotic medication on an involuntary basis. Dkt. 106, First Quirk Decl. (Appendix

13  1) at 9-10.

14    He opines that plaintiff's presentation of occasional progress, including refraining

15  from infractions and then engaging in violent and/or disruptive behavior when he nears

16  consideration for release from restrictive housing, is a pattern of behavior that is often

17  indicative of individuals who do not want to actually progress to less restrictive settings.

18  *Id.* at 9-10.

19    Dr. Quirk opines that plaintiff's risk of danger to others has also persistently

20  remained elevated over the years, as described in the following manner in Drs. Dean

21  and Richie's Forensic Psychiatric Report in 2009:

22        Mr. Williams has informed us verbally (and demonstrated with his actions
          at WSH and in the jail) that he is capable of unpredictable behavior in a
23        calculated/planned manner, which can occur even when he appears calm and
          without apparent provocation or immediate stressors. He may at any time be
24        awaiting the opportunity to exact what he considers revenge for a prior slight or

25  REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 33

injustice (as in the recent episode when he was angry that his water was turned off, and awaited the opportunity to stab a correctional officer in the hand, in what he later rationalized as the failure of the jail mental health system to prevent him from acting on his anger). For the same reasons, it would be highly unwise to provide Mr. Williams with any writing implements during court proceedings, or with any other opportunity or implement with which to harm others. Again, we emphasize that his current risk for violent behavior stems from his antisocial personality pathology and not from any major mental illness" (p. 19).

*Id.* at 11 and Ex. 16.

Dr. Quirk notes that in a recent June 6, 2023, Mental Health Update and Treatment Plan, psychiatric ("PCL-R") testing was performed based on a records review, as plaintiff refused to meet with mental health. Dkt. 185, Second Quirk Decl., (Appendix 2) at 6-7. Based on the results of that test, it was concluded:

"What is evident is Mr. Williams [sic] failure to conform to societal norms in respects to lawful behaviors, deceitfulness, impulsivity, aggressiveness and irritability, reckless regard for safety of others, and lack of remorse which is all indicative of Antisocial Personality disorder; this will continue as his primary diagnosis at this time. All of his exhibited behaviors appears [sic] to be directly related to this disorder and are behavioral in nature rather than being related to disorganized behaviors of SMI diagnosis…"

*Id.* Dr. Quirk opines that the PCL-R information contained in this evaluation confirmed his clinical opinion that plaintiff evidences psychopathic traits and research has indicated that psychopathy is associated with increased risk of future dangerousness towards others. *Id.*

Dr. Quirk also states that, in his clinical opinion, plaintiff continues to view his interactions with WADOC mental health staff as transactional. *Id.* at 8. He states that in plaintiff's view, mental health staff are not of benefit to him because they provide mental health treatment or other clinical interventions (he has declined those services). *Id.* Instead, he views their role as individuals who can provide him with items he wants,

1   such as handouts, articles, food, and other items. *Id*. Dr. Quirk states that this is

2   consistent with someone with antisocial personality order. *Id.*

3       Dr. Quirk also cites to a letter plaintiff wrote while at WCC-IMU to CUS Bailey in

4   which Dr. Quirk notes plaintiff presents a conditional offer, one in which he would obtain

5   requested items (food, coffee, a radio and TV) in exchange for the cessation of feces

6   smearing, self-harm, and threats to staff. *Id*. at 8-9. Dr. Quirk states that, if these

7   behaviors were the result of a serious mental illness (in particular, feces smearing

8   behavior) then food and coffee incentives would not be expected to reduce the

9   behaviors. *Id.*

10      Instead, the frontline treatment for such psychiatric decompensation would be

11  antipsychotic medications. Dkt. 185, Second Quirk Decl., (Appendix 2) at 8-9. Dr. Quirk

12  states that with this request plaintiff is affirming that his behaviors are not the result of a

13  serious mental illness. *Id.*

14      Dr. Quirk notes that there have been some recent successes for plaintiff. *Id.* at

15  10. For instance, Dr. Quirk notes that at MCC-IMU, the mental health staff reported that

16  with the implementation of an IBMP (incentives included printouts of requested articles,

17  snacks, and coffee) there had been observed, incremental improvements in plaintiff's

18  behavior. *Id.*

19      However, Dr. Quirk opines that:

20      [I]t remains my clinical opinion that the method in which Mr. William is safely
        progressed to a less restrictive setting remains elusive. This is because, the
        Department has attempted a number of interventions and they have been

21      unsuccessful to date. Ultimately the measure of success lies within Mr. Williams.
        Mr. Williams remains dangerous around others and his repeat threats are

22      concerning. In my opinion his behaviors are the result of the combined presence
        of psychopathic traits and antisocial and narcissistic personality disorders. With

23      this clinical background and Mr. Williams history of extreme violence, the risk of
        harm he presents to others is significant in my opinion.

24

25  REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 35

1

…

2

3

Given the combination of his past institutional and community violence, severe character pathology, presence of emotion dysregulation, his frequent statements of homicidal intent of the years, and continued threats to harm staff, there is a very high probability, in my opinion, that if Mr. Williams is immediately, directly released to a less restrictive setting at this time then he will represent a high risk of danger towards others. He has not evidenced any improvement in these identified areas of concern. Further he has not participated in mental health treatment nor available offender change programming which, if he did, could contribute to reducing his future risk of danger towards others. There is no evidence, that I am aware of at this time, to suggest that Mr. Williams could safely navigate a less restrictive setting at this time. I offer this opinion with a high degree of clinical confidence given the risk factors and concerns listed above and described throughout this declaration and in my prior report.

4

5

6

7

8

Despite these significant barriers to Mr. Williams's progression to a less restrictive setting, I know the Department is committed to continuing to work with Mr. Williams to mitigate the potential risk of danger to allow him to promote to a less restrictive setting.

9

10

Dkt. 185, Second Quirk Decl., (Appendix 2), at 10-11.

11

**b) Legal Standards**

12

Summary judgment is supported "if the pleadings, the discovery and disclosure

13

materials on file, and any affidavits show that there is no genuine issue as to any

14

material fact and that the movant is entitled to judgment as a matter of law." FRCP

15

56(c). The moving party bears the initial burden to demonstrate the absence of a

16

genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323

17

(1986). A genuine dispute concerning a material fact is presented when there is

18

sufficient evidence for a reasonable jury to return a verdict for the non-moving party.

19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which

20

is "relevant to an element of a claim or defense and whose existence might affect the

21

outcome of the suit," and the materiality of which is "determined by the substantive law

22

governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d

23

626, 630 (9th Cir. 1987).

24

25

1    When the Court considers a motion for summary judgment, "[t]he evidence of the

2    non-movant is to be believed, and all justifiable inferences are to be drawn in [their]

3    favor." *Anderson*, 477 U.S. at 255. Yet the Court is not allowed to weigh evidence or

4    decide credibility. *Id.* at 255. If the moving party meets their initial burden, an adverse

5    party may not rest upon the mere allegations or denials of his pleading; his or her

6    response, by affidavits or as otherwise provided in FRCP 56, must set forth specific

7    facts showing there is a genuine issue for trial. FRCP 56(e)(2). The Court may not

8    disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck &*

9    *Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

10    In response to the motion for summary judgment, the nonmoving party is

11    required to present specific facts, and cannot rely on conclusory allegations. *Hansen v.*

12    *U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific

13    facts that are presented by the non-moving party, considered along with undisputed

14    context and background facts, would show that a rational or reasonable jury might

15    return a verdict in the non-moving party's favor based on that evidence. *Emeldi v.*

16    *University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

17    To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the

18    conduct complained of was committed by a person acting under color of state law, and

19    (b) the conduct deprived a person of a right, privilege, or immunity secured by the

20    Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535

21    (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section

22    1983 is the appropriate avenue to remedy an alleged wrong only if both of these

23    elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

24

25    REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 37

To establish liability for individual defendants under Section 1983, an inmate must show that each of the defendants was involved in violating the Constitution; liability of an official will only be found if there is individual culpable action or inaction. *Hines v. Youseff,* 914 F.3d 1218, 1228 (9th Cir. 2019).

Unless plaintiff makes a two-part showing, qualified immunity shields government officials from liability for damages. The plaintiff must show both: the official(s) violated a federal statutory or constitutional right, and at the time of the alleged act or failure to act there was clearly established law that defined the contours of the federal right objectively putting the official(s) on notice – i.e., any reasonable official would understand that what they are doing is unlawful. *Escondido v. Emmons*, 139 S.Ct. 500 (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

When qualified immunity is reviewed in the context of a defense motion for summary judgment, the evidence must be considered in the light most favorable to the plaintiff with respect to central facts. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). If there is a genuine issue of material fact concerning both: (1) Whether it would be clear to a reasonable officer that their conduct was unlawful under the circumstances they confronted, and (2) Whether the defendant's conduct violated a constitutional right, then summary judgment granting qualified immunity is not appropriate. *Bonivert v. City of Clarkston*, 883 F.3d 865, 871-72 (9th Cir. 2018).

To determine whether there was clearly established law, the Court has stated, "[w]hile there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate"; and the Court has also observed, "there can be the rare obvious case, where the unlawfulness of the officer's

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 38

1   conduct is sufficiently clear even though existing precedent does not address similar

2   circumstances." *Wesby*, 138 S.Ct. at 590. A clearly established right exists if "controlling

3   authority or a robust consensus of cases of persuasive authority" have held, on facts

4   that are close or analogous to the current case, that such a right exists. *Hines*, 914 F.3d

5   at 1229-30.

6        In some contexts, there may be a general constitutional rule that has been

7   identified in court decisions – and it may apply with such obvious clarity to the specific

8   conduct of a defendant, that qualified immunity will not apply even though existing case

9   law did not describe the specific factual scenario in the current situation. *United States*

10  *v. Lanier*, 520 U.S. 259, 271 (1997); *Bonivert*, 883 F.3d at 872-73. If qualified immunity

11  operated as a shield for all conduct that was not specifically addressed in existing case

12  law at the time of the event in question, then officials would not ever be held

13  accountable for unprecedented constitutional violations that would appear obvious.

14  *Hope v. Pelzer*, 536 U.S. 730, 740-42 (2002) (finding that a correctional officer's act of

15  handcuffing an inmate to a hitching post in a painful position under dangerous and

16  degrading circumstances was "antithetical to human dignity" and so obviously wanton,

17  painful and cruel under the Eighth Amendment that the officer had fair notice that this

18  was unlawful under existing legal precedent).

19       The Constitution does not mandate comfortable prisons, but neither does it

20  permit inhumane prisons. *Farmer v. Brennan*, 511 U.S. 825, 832 (1970). Under the

21  Eighth Amendment, prison officials are required to provide prisoners with basic life

22  necessities, such as food, clothing, shelter, sanitation, medical care, and personal

23  safety. *Id.*; *Toussaint v. McCarthy*, 801 F.3d 1080, 1107 (9th Cir. 1986). The

24

25  REPORT AND RECOMMENDATION ON
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
    MOTION FOR EXTENSION OF TIME (DKT. 198) - 39

circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (precluding summary judgment where prison officials wholly restricted inmates' access to toilets for an entire night, resulting in inmates soiling themselves).

To state a claim for unconstitutional conditions of confinement, a plaintiff must make two showings: (1) an "objective" showing that the deprivation was "sufficiently serious" to form the basis for an Eighth Amendment violation; and 2) a "subjective" showing that the prison official acted "with a sufficiently culpable state of mind." *Wilson v. Seiter,* 501 U.S. 294, 298, (1991); *Johnson*, 217 F.3d at 731. Regarding the first requirement, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Regarding the second requirement, the state of mind that must be shown is one of "'deliberate indifference' to inmate health or safety[.]" *Farmer*, 511 U.S. at 834 (citing *Wilson*, 501 U.S. at 302-03). A prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

"Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted); *see Hudson v. McMillan*, 503 U.S. 1, 6 (1992). An Eighth Amendment medical claim has two elements: (1) "the seriousness of the prisoner's medical need and [(2)] the nature of the defendant's response to that need." *McGuckin*

1  *v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX*

2  *Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

3    "The Eighth Amendment prohibits deliberate indifference not only to an inmate's

4  current health problems, but also to conditions of confinement that are very likely to

5  cause future serious illness and needless suffering." *Graves v. Arpaio*, 48 F. Supp. 3d

6  1318, 1335 (D. Ariz. 2014), *amended*, No. CV-77-00479-PHX-NVW, 2014 WL 6983316

7  (D. Ariz. Dec. 10, 2014), and *judgment terminated sub nom. Graves v. Penzone*, No.

8  CV-77-00479-PHX-NVW, 2019 WL 4535543 (D. Ariz. Sept. 19, 2019) (citing *Helling v.*

9  *McKinney,* 509 U.S. 25, 33 (1993)).

10    A medical need is serious "if the failure to treat the prisoner's condition could

11  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

12  *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). "The existence of an

13  injury that a reasonable doctor or patient would find important and worthy of comment or

14  treatment; the presence of a medical condition that significantly affects an individual's

15  daily activities; or the existence of chronic and substantial pain are examples of

16  indications that a prisoner has a 'serious' need for medical treatment." *Id.* at 1059-1060.

17    If a plaintiff shows he suffered from a serious medical need, he must then show

18  the prison officials responded to the need with deliberate indifference. *See Farmer*, 511

19  U.S. at 834. Deliberate indifference to a prisoner's serious medical need requires "a

20  purposeful act or failure to act on the part of the defendant." *McGuckin*, 974 F.2d at

21  1060.

22    In other words, "[a] defendant must purposefully ignore or fail to respond to a

23  prisoner's pain or possible medical need." *Id.* A prison official, accordingly, will not be

24

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 41

found deliberately indifferent to a prisoner's serious medical needs "unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or [] may be shown by the way in which prison physicians provide medical care." *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988). However, "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Id.* The Court also recognizes mere differences of opinion between a prisoner and prison medical staff or between medical professionals regarding the proper course of treatment does not give rise to a § 1983 claim. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.* (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Some Courts have found that holding inmates with serious mental illness in prolonged isolated confinement may cause serious illness and needless suffering in violation of the Eighth Amendment. *Graves*, 48 F. Supp. 3d at 1335 (citing *Coleman v. Brown*, 938 F.Supp.2d 955, 979 (E.D. Cal. 2013) (mentally ill inmates in administrative segregation faced substantial risk of serious harm, including exacerbation of mental

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 42

1    illness and potential increase in suicide risk)). "To determine whether segregated

2    confinement meets constitutional standards, courts must consider both the length of the

3    segregated confinement of inmates with serious mental illness and the specific

4    conditions of the confinement." *Id.* (citing *Hutto v. Finney,* 437 U.S. 678, 686 (1978)).

5        Conditions that have been considered in making this determination include: "(1)

6    the length of time prisoners with mental illness spent in solitary confinement

7    (approximately 22 hours or more a day); (2) the extent to which solitary confinement

8    interfered with prisoners' ability to obtain adequate mental health treatment; (3) the

9    conditions accompanying the solitary confinement experienced by prisoners with

10   serious mental illness; and (4) the extent to which systemic deficiencies at the facility,

11   *e.g.,* deficiencies in mental health programming, screening, and accountability,

12   contributed to an overreliance on solitary confinement as a means of controlling

13   prisoners with serious mental illness." *Id.* (citing *Coleman,* 2013 WL 6071977

14   (publication of the United States Department of Justice, Civil Rights Division)).

15           **c)  Analysis**

16       Plaintiff contends defendants were deliberately indifferent, and violated his Eighth

17   Amendment rights, by keeping him in Max custody despite its negative impact on his

18   mental health.[8]

19       Defendants argue that plaintiff fails to show his constitutional rights were violated

20   by placing and maintaining him in Max custody. Defendants' expert Dr. Quirk opines

21

22   _____

23   [8] The Court notes that plaintiff characterizes his continued placement in Max custody as "solitary
     confinement." While defendants present evidence that Max custody provides some
     opportunities for out-of-cell and group programming, they do not appear to dispute that plaintiff
24   has spent the majority of his time in isolation.

     REPORT AND RECOMMENDATION ON
25   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 43

1    that plaintiff's non-compliant, threatening, violent, and feces smearing behaviors have

2    no nexus to a serious mental illness (psychotic and/or mood disorder) but are instead

3    the product of plaintiff's personality disorder and psychopathic traits, are volitional, and

4    are often used to punish or manipulate prison staff. Dkt. 106, First Quirk Decl.

5    (Appendix 1) at 2-3, 8-10; *and see* Dkt. 185, Second Quirk Decl. (Appendix 2). Dr. Quirk

6    indicates that his opinion is based on several factors including that many of plaintiff's

7    threats to smear feces are conditional or in response to some external stimulus or

8    perceived slight, the fact that plaintiff did not mentally decompensate when he was

9    taken off of involuntary psychiatric medication in 2015, and that these behaviors have

10   been present across time over the course of his current incarceration, whether plaintiff

11   has been in residential treatment (SOU-ITU) or non-psychiatric housing (IMU), and

12   whether or not he has been prescribed antipsychotic medication on an involuntary

13   basis. *Id.* First Quirk Decl. (Appendix 1) at 2-10. Additionally, Dr. Quirk notes that

14   plaintiff generally does not smear feces on his own body, and that, based on a review of

15   plaintiff's infraction record, that plaintiff did not appear to smear feces during his first

16   incarceration, where he spent a prolonged period in solitary confinement. *Id.* at 6-7.

17          Plaintiff presents evidence in opposition to defendants' motion challenging Dr.

18   Quirk's opinion. Dkt. 199. Plaintiff presents DOC records reflecting that he did, in fact,

19   smear feces on several occasions during his first incarceration, and that there were

20   numerous occasions on which he has smeared feces on his body.[9] *See* Dkt. 199, Exs.

21   14, 36-44.

22

23   _____

[9] It appears that, while noted in observations by DOC staff in the records from plaintiff's first
incarceration, plaintiff may not have received infractions for this behavior, or the infractions may
have been denominated something different from "884" during that period of time.

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 44

Plaintiff also cites to observations by other DOC staff that he was observed on several occasions as presenting with symptoms of psychosis – in particular that he would be talking to people who are not there as well as responding to people who are not present. *See id.*, Exs. 46-60. Plaintiff also contends Dr. Quirk fails to address his contention that his prolonged placement in solitary confinement has caused him to engage in self-harm on several occasions. *Id.* at 23-24.

The record before the Court, including records submitted by plaintiff, contains voluminous mental health records spanning the course of plaintiff's current incarceration (beginning in 2009) as well as some related to his previous incarceration. These records reflect numerous different mental health diagnoses by various medical providers over the years and that there is conflicting medical evidence and opinions as to the extent to which plaintiff's violent, destructive, self-harming, and feces smearing behavior is the product of a serious mental illness as opposed to purely volitional and stemming from a personality disorder diagnosis.

For instance, as plaintiff notes, there are several observations noted by providers at various points during plaintiff's incarceration that plaintiff appeared to be exhibiting signs of psychosis. *See, e.g.*, Dkt. 199 at 93 (citing "unspecified psychosis"), 95 (primary encounter note dated 7/30/09 stating plaintiff "appears more psychotic"), 141 (8/31/17 "continues to present with some symptoms of psychosis"), 249 ("suffers from a very serious psychotic mental illness").

There is also some evidence that, although plaintiff's feces smearing and violent behaviors continued, several mental health providers felt plaintiff did show some degree of stabilization and improvement for some period when he was placed on involuntary

1    psychiatric medication. *See, e.g.,* Dkt. 199 at 68 (Involuntary Antipsychotic Hearing

2    Minutes Statement for 4//19 "most recently, [plaintiff] has demonstrated some progress

3    when taking antipsychotic medications as evidence by him interacting more

4    appropriately with others and seeking out more interactions."), 128 ("great gains on

5    involuntary medication"), 250 (12/19/03 when appropriately medicated "behavior

6    became noticeably more compliant and stable, with better interactions with staff"), 270,

7    271, 281 ("when taking psychotropic medications … appears to experience a decrease

8    in psychotic symptoms, but presents as more antisocial …behavior such as smearing

9    feces are considered volitional"), 302 (while on medications remains quite symptomatic

10   while off medications becomes increasingly delusional and increasingly violent …

11   repeated return to assaultive behaviors even on medications."), 391 (continues to have

12   problems but behavior appears to be in better control while medicated), 475 (appears

13   plaintiff becomes less hostile and paranoid on medications, although demonstrates

14   some improvement on medications he will continue to engage in disruptive behaviors).

15       Dr. Rainer also acknowledges in her declaration that plaintiff has had a number

16   of diagnoses over the years including antisocial personality disorder, attention deficit

17   hyperactivity disorder, unspecified psychosis, bipolar and antisocial personality disorder,

18   substance dependence, schizophrenia and borderline personality disorder, and that

19   "often for individuals with such diagnoses, and for Williams, there are some behaviors

20   and issues that result from the personality disorder, which can be more volitional, and

21   other behaviors that are consistent with a serious mental illness." Dkt. 105 (Rainer

22   Decl.) at 3-4.

23

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 46

1    Dr. Quirk acknowledges that "there have been differing opinions over the years

2    regarding [plaintiff's] diagnostic picture", including by himself, but asserts that "what

3    remains clear is that Williams has consistently demonstrated traits of psychopathy." Dkt.

4    106, First Quirk Decl. (Appendix 1) at 9. He opines that plaintiff's behavior is volitional

5    and a product of his antisocial personality disorder, narcissistic personality disorder, and

6    psychopathic traits, and that his feces smearing and violent behaviors have no nexus

7    with a serious mental illness (psychotic and/or mood disorder.). *Id.*

8    Dr. Quirk's declaration does not clearly address the evidence discussed above

9    which appears to be at least to some extent inconsistent with some aspects of his

10    opinion. Accordingly, the Court cannot conclude that the record definitively establishes,

11    as defendants argue, that plaintiff's behaviors are *always* wholly volitional and in no way

12    connected to a serious mental illness.

13    However, plaintiff points to no evidence to indicate that defendants were

14    subjectively aware that plaintiff's placement or retention in Max custody imposed an

15    excessive risk of harm to his health or safety, and that they disregarded that risk.[10]

16    Plaintiff names only two defendants, former DOC Secretary Stephen Sinclair and former

17    Mission Housing Administrator (MHA) Timothy Thrasher. Plaintiff alleges defendants

18    Sinclair and Thrasher were aware all along that solitary confinement was exacerbating

19    plaintiff's mental illness to the point it was causing him to smear feces, cut himself, and

20

21    _____
[10] If the Court disagrees with the analysis and conclusion of this Report and Recommendation,

22    that plaintiff – on the existing record in this matter -- fails to raise a genuine issue of material fact
as to whether defendants acted with deliberate indifference, and given that plaintiff is currently

23    unrepresented by counsel, the Court may decide to issue an order to show cause, and consider
whether it may be appropriate to appoint a neutral psychiatric expert, or other experts, to

24    examine the records and conduct an evaluation of plaintiff in this case. *See* Federal Rule of
Evidence 706.

25    REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 47

assault staff, and decided to keep plaintiff in solitary confinement anyway. Dkt. 123. But plaintiff fails to allege sufficient facts, or point to specific evidence, to support this conclusory assertion.

A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir. 1989). Under the latter theory, "[s]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of a constitutional violation.'" *Id.* at 646 (quoting *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir.1987)). "When a supervisory official advances or manages a policy that instructs its adherents to violate constitutional rights, then the official specifically intends for such violations to occur [and c]laims against such supervisory officials, therefore, do not fail on the state of mind requirement, be it intent, knowledge, or deliberate indifference." *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

With respect to defendant Sinclair, plaintiff fails to demonstrate that he was personally involved in the alleged constitutional violation. Plaintiff alleges no facts, and points to no evidence, to demonstrate defendant Sinclair personally decided to place or maintain plaintiff in Max custody or that he was even aware of plaintiff's placement or retention on Max custody or of any alleged specific risk of harm to plaintiff.

Plaintiff also fails to demonstrate defendant Sinclair implemented a policy so deficient that the policy itself was a repudiation of constitutional rights or is the moving

1    force of a constitutional violation. Defendants present evidence that the relevant policy

2    provides for considerations of mental health in making decisions about placing and

3    retaining individuals in Max custody. For instance, defendants present evidence that the

4    Max Custody Committee, that makes decisions about placing or retaining an individual

5    on Max custody, is a multidisciplinary team made up of representatives from custody,

6    classification, mental health, special investigative services, substance abuse and

7    recovery unit, and cognitive behavioral intervention unit. Dkt. 183 (Bowen Decl.) at 2.

8    Defendants also present evidence that plaintiff spent a significant amount of time in the

9    ITUs, where he received increased and more intensive access to mental health

10   treatment, and that he was placed on involuntary antipsychotic medications on several

11   occasions in an attempt to address his apparent symptoms and behaviors. *See, e.g.*,

12   *id.*; Dkt. 104 (Second Thrasher Decl.) at 21-29; Dkt. 105 (Rainer Decl.) at 2-3 ("RTU

13   services include: assessment of mental health concerns; development of a formal

14   Treatment Plan; individual psychotherapy; group psychotherapy; relapse prevention,

15   recovery, rehabilitation, and habilitation services in individual, group, classroom and

16   other settings; medication and pharmacy services; transition services targeted at

17   preparing the individual for return to the community; and release planning.").

18          Plaintiff fails to identify any specific deficiencies in the relevant policies that

19   constitute a repudiation of a constitutional right or constitute the moving force behind a

20   constitutional violation.

21          With respect to defendant Thrasher, the record shows he was the MHA from

22   2013 to 2021 and sat on the Max Custody Committee from 2012 to September 2021.

23   Dkt. 104 (Second Thrasher Decl.) at 1-2. But plaintiff fails to identify any specific

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 49

decision, action or inaction, by defendant Thrasher that evidences he was aware plaintiff's retention in Max custody placed him at an excessive risk of harm, and that he disregarded that risk.

In support of his claim plaintiff relies on an article published in a law review authored by Dr. Stewart Grassian indicating that prolonged solitary confinement can be significantly detrimental to the mental and physical health of individuals and particularly those who are mentally ill. However, Dr. Grassian's article does not address *plaintiff's* case-specific individual mental health issues or behavior.

Plaintiff points to no medical opinion or evidence in the record to indicate that plaintiff's behaviors are *caused by* his placement in prolonged solitary confinement or specific evidence that placed defendants on notice that plaintiff's behaviors were a product of the exacerbation of his mental health symptoms from being held in prolonged solitary confinement.

Although there were differing opinions by different mental health providers regarding plaintiff's appropriate diagnosis and how to best treat him and address his behaviors, plaintiff points to no evidence that those providers, or any other DOC official, attributed plaintiff's behavior or symptoms to his placement in Max custody. *See, e.g., Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006) (Finding no Eighth Amendment violation where plaintiff failed to cite evidence to overcome the defendants' denials that they knew the conditions in Supermax prison were making plaintiff's mental illness worse).

Furthermore, plaintiff began his current incarceration on May 28, 2009, and his initial June 8, 2009, classification assignment recommendation was close custody with

mental health treatment; he was initially assigned to close custody. Dkt. 104 (Second

Thrasher Decl.) at 3. However, plaintiff engaged in feces smearing on June 17, 2009,

only a few weeks after being incarcerated at DOC for the most recent conviction and

before being formally assigned to Max custody. Dkt. 106, First Quirk Decl. (Appendix 1)

at 7. The record shows on July 28, 2009, a Custody Facility Plan was initiated, and

plaintiff was recommended for Max custody due to violent behavior having been found

guilty of infractions for assaulting staff, tampering with a lock/security device, and

threatening. Dkt. 104 (Second Thrasher Decl.) at 21, 354-363.

The record shows plaintiff was placed on Max custody on September 23, 2009,

and that despite some short periods of improved behavior, he has continued to engage

in violent, threatening, and disruptive behavior, has continued to smear feces on a

regular basis, and, as a result, has not progressed to a less restrictive custody status.

*See, id.* The record reflects that plaintiff's behaviors were present from the beginning of

his current incarceration, before he was even formally placed in Max custody, and that

he was placed on Max custody because of these behaviors (specifically his violent,

threatening behaviors), not that these were new behaviors that developed after being on

Max custody for an extended period. *Id.* at 3, 21, 354-363; Dkt. 106, First Quirk Decl.

(Appendix 1) at 7.

The record also shows that plaintiff has spent significant periods of time in the

ITU units during his incarceration, where he has had increased access to more

specialized and intensive mental health treatment, and that he has been placed on

involuntary antipsychotic medication for extended periods of time on several occasions,

but that these behaviors have remained fairly consistent whether he is housed in the

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 51

IMU or the ITU and whether he is on involuntary psychiatric medication or not.[11] Dkt.

106 and App. #1 (First Quirk Decl.) at 7-10; Dkt. 185 (Second Quirk Decl.); Dkt. 104

(Second Thrasher Decl.) at 21-29, 98-112. Plaintiff contends he does not engage in

feces smearing, assault, or self-harming behavior when he is in the general population,

but he does not point to specific evidence to support this assertion. Dkt. 199 at 23-24.

Plaintiff points to no medical or other evidence in the record indicating

defendants, or any other specific DOC employee, became aware of any connection

between plaintiff's placement in Max custody and any exacerbation of plaintiff's mental

health symptoms -- nor  has plaintiff shown that his placement in Max custody was the

cause of his behavioral problems such that he was unable to comply with the

programming and behavioral requirements for promotion out of Max custody. Plaintiff

points to no evidence demonstrating that defendants, or any DOC employee for that

matter, were subjectively aware that plaintiff's placement or continued placement in Max

custody, despite the fact that there was an avenue under the policy to be promoted out

of Max custody, constituted an excessive risk to his health or safety.[12]

---

[11] Plaintiff challenges the defendants' evidence that he smeared feces consistently whether he was in the ITU and the IMU and whether he was on or off involuntary psychiatric medications. Dkt. 199 at 21-22. However, plaintiff's calculations show he smeared feces when he was on involuntary antipsychotic medication (84 infractions for smearing over the course of 8 years and 6 months) and also when he was not on involuntary antipsychotic medication (77 infractions for smearing over the course of 14 years and 3 months), while he was in the IMU (77 infractions for smearing over the course of 7 years and 4 months) and also when he was in the ITU (86 infractions for smearing over the course of 12 years and 1 month), overall, the record reflects that this behavior continued across all of these circumstances. *Id.*; Dkt. 106, First Quirk Decl. (Appendix 1) at 7-10; Dkt. 185, Second Quirk Decl. (Appendix 2) at 21-29, 98-112.

[12] Plaintiff notes that he has engaged in self-harm on several occasions over the course of his incarceration. But plaintiff does not allege the defendants failed to adequately provide him with medical or mental health treatment on these occasions and plaintiff does not point to evidence that defendants were subjectively aware that this behavior was a product of exacerbated mental

Plaintiff points to no medical evidence and presents no expert testimony stating that *his* mental health symptoms have been exacerbated by his retention in Max custody or opining that the specific conditions in DOC's Max custody housing posed a substantial risk of serious harm to plaintiff or mentally ill inmates.

Yet, recent case law explores the growing body of literature on the potential significantly detrimental psychological and emotional effects of solitary and segregated confinement. *See, e.g.*, *Porter v. Clark*, 923 F.3d 348 (4th Cir. 2019) (citing cases acknowledging the growing body of scientific literature on this issue). The Court in *Porter* opined that "the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm 'was so obvious that it had to have been known' [by prison officials]." *Porter*, 923 F.3d at 361.[13]

But even if the Court were to find that the record is sufficient here to raise an issue of fact as to whether defendants were subjectively aware that plaintiff's placement and retention in Max custody in fact posed an excessive risk of harm to plaintiff's mental health, the record does not support the conclusion that defendants disregarded that risk. Rather, the record shows that reasonable steps were taken to abate any serious risk of harm to plaintiff's mental health.

Specifically, the record shows that DOC staff worked to try to treat and address plaintiff's mental health issues and to work with plaintiff to complete programming and

---

health symptoms caused by his placement in long-term solitary confinement, or that they failed to take reasonable steps to abate the risk of harm to plaintiff.

[13] The Court notes that in *Porter* it appears there was also expert testimony in the record addressing the specific conditions in that case. *Porter*, 923 F.3d at 356.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 53

refrain from dangerous behavior in order to secure his release from Max custody. *See, e.g., Denton v. Rainer*, No. C-19-5743-BHS, 2023 WL 5609213 (W.D. Wash. Aug. 30, 2023) (granting summary judgment for DOC defendants finding plaintiff's Eighth Amendment rights were not violated by housing him in Max custody despite his mental health issues because, although defendants were placed on notice that long-term isolation was negatively affecting plaintiff's mental health, the record showed defendants took "reasonable measures to abate the risks to plaintiff's mental health" by "actively engaging with him to encourage his compliance and to devise a plan that would help him be successful outside of Max custody.").

Defendants present evidence that under DOC's Max custody policy, determinations on placement and retention in Max custody are made by a multi-disciplinary team which includes mental health staff. Dkt. 183 (Bowen Decl.) at 2. The record also reflects that DOC staff attempted to attend to plaintiff's mental health needs. Defendants present evidence that plaintiff was assigned to an ITU for significant portions of his time in Max custody where he had access to additional more intensive mental health services such as assessment of mental health concerns, development of a formal Treatment Plan, individual psychotherapy, group psychotherapy, and habilitation services in individual, group, classroom and other settings and medication and pharmacy services. Dkt. 105 (Rainer Decl.) at 3-4; Dkt. 104 (Second Thrasher Decl.) at 21-29.

And the record shows plaintiff often refused to participate in mental health treatment when he was housed in the ITU. *See, e.g.,* Dkt. 105 (Dr. Rainer stating "Williams has been in and out of RTUs and a restrictive setting throughout his

incarceration. … I recall that Williams' movement in and out of RTUs is related to his failure to meaningfully participate in mental health programming and avail himself to the services offered in the RTUs. At times, Williams's behavior also interferes with the progress of others in the RTUs."); Dkt. 104 (Second Thrasher Decl.), Ex. 101 ("[plaintiff] has been in prison for murder since 2009. He has been in the IMU the entire time…He has not put forth meaningful effort in working with mental health staff nor has he engaged in programming. Numerous approaches and interventions have been attempted with Williams, whose resistance, volatility, propensity to disturb others and threatening/aggressive behaviors continue despite.").

Plaintiff does not argue that defendants failed to offer or provide him with adequate mental health treatment in the ITU or IMU and does not appear to dispute that he frequently refused to participate in mental health treatment. A prisoner's refusal to accept, comply with, or participate in medical treatment does not demonstrate deliberate indifference on the part of the prisoner's medical providers. *See Zatko v. Rowland*, 835 F. Supp. 1174, 1179 (N.D. Cal. 1993) (dismissing an Eighth Amendment claim alleging the denial of psychiatric care as "factually frivolous" where plaintiff's internal prison records filed in another action showed that he had refused to participate in a psychiatric evaluation); *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (holding that no deliberate indifference occurred when an inmate refused offered medical care and was uncooperative with medical staff); *Walker v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (granting summary judgment in favor of prison officials on an Eighth Amendment claim where the prisoner-plaintiff refused to take a preliminary test that prison officials

required to confirm his diagnosis before beginning treatment, and explaining that "[a]s a competent adult, [the inmate] was free to refuse treatment").

Defendants also present evidence that plaintiff was placed on involuntary psychiatric medications several times over the course of his incarceration in an effort to address plaintiff's apparent mental health symptoms. *See, e.g.*, Dkt. 104 (Second Thrasher Decl.) at 21-29; Dkt. 106, First Quirk Decl. (Appendix 1) at 7-8; Dkt. 199 at Exs. 11, 12. While there is some indication that some of plaintiff's mental health issues partially stabilized for some period on medication, again the record reflects that plaintiff's violent, threatening, and feces smearing behaviors continued fairly consistently whether plaintiff was in the ITU, IMU, or on or off involuntary psychiatric medications.

The record also reflects that DOC staff worked to encourage plaintiff to participate in programming and implemented different plans to work with plaintiff to control his violent and feces smearing behavior. *See, e.g.*, Dkt. 104 (Second Thrasher Decl.) at 21-29; Dkt. 183 (Bowen Decl.) at 5-11. Defendants present evidence that the programming in Max custody addresses pro-social thinking, alternatives to violence, education, mental health interventions, substance abuse and other need areas common for individuals assigned to Max custody. Dkt. 104 (Second Thrasher Decl.) at 2. Defendants present evidence that individuals on Max custody may also have programming and activities in a congregate classroom and other out-of-cell opportunities consistent with reasonable safety and security practices, and the opportunity to earn levels and obtain greater privileges based on behavior. *Id.* at 3; Dkt. 183 (Bowen Decl.) at 3. The record reflects that plaintiff was given the opportunity and

encouraged to participate in various programming and that DOC staff tried various interventions, including implementing IBMPs in efforts to reinforce positive behaviors, to work with plaintiff so that he could be safely moved to a less restrictive environment. *See generally, supra* Section B.2.a.ii.

Plaintiff does not directly dispute the evidence of the efforts made to provide and encourage plaintiff to participate and complete programming and progress through the level system in order to ultimately progress to a less restrictive custody level. Plaintiff argues only that defendants violated the Eighth Amendment because they have kept him on Max custody.

Defendants also present evidence that over the past several years DOC has implemented efforts to decrease the use of Max custody. Defendants present evidence the DOC has reduced Max custody by 40% in 2021-2022 and that in early June 2023, it initiated its restrictive housing transformation project with the objective to "Develop a plan representing a comprehensive pathway to effectively eliminate 90% of solitary confinement within the next five years[.]" Dkt. 183 (Bowen Decl.) at 4-5. They present evidence DOC has taken some steps in furtherance of the project including creating and employing AMEND resource teams to at least one facility which provide one on one services to individuals in Max custody and provide quality out of cell time including playing games, drinking coffee and basic dialogue, increasing its resources in restricted housing units at WSP-IMU allowing for an increase in out-of-cell time from one to three hours, and hiring Dr. Ryan Quirk as head of Forensic Psychology to assist in assessing

risk and considering alternative options for individuals on Max custody.[14] *Id.* They

present evidence DOC has also developed progression pods to act as a diversion from

Max custody or a promotion from Max custody and that the pods will be in the restricted

housing unit with four hours out of cell time and congregate programming, human and

social interaction. *Id.*

The record also contains evidence that, given plaintiff's consistent violent and

disruptive behavior, there was a legitimate concern on the part of DOC staff for the

safety of other inmates, staff, and the plaintiff himself if he were to be moved to a less

restrictive environment. For instance, defendants present evidence from current DOC

MHA Kevin Bowen that,

> Even without the threats of violence, I have safety concerns related to Mr.
> Williams' other behaviors. His smearing, destruction of unit property, frequent
> door kicking, flooding the tier, and berating staff would likely not be accepted by
> the other incarcerated population. Promoting Mr. Williams to a less restrictive
> environment while he continues these behaviors would cause me concern for Mr.
> Williams' safety as I could see this causing tension and potential physical
> altercations between incarcerated individuals. .... Ultimately, without the
> cessation or significant decrease of these violent threats, aggressive behaviors,
> and disruptive behaviors, I have significant concerns about Mr. Williams ability to
> be safely promoted to a less restrictive setting. …

Dkt. 183 (Bowen Decl.) at 10. They also present evidence from former DOC MHA

Timothy Thrasher that:

> DOC records show that Williams has been in Max custody since
> September 23, 2009 due to his violent behaviors and constant graphic threats of
> physical harm and assault to Department staff. His behaviors make it unsafe for
> staff, other offenders and himself for him to be placed in general population.

Dkt. 104 (Second Thrasher Decl.) at 21. Defendants also present evidence from

Dr. Quirk that:

---

[14] Dr. Quirk also states that he attempted to meet with plaintiff in 2023 for purposes of such an
assessment and that plaintiff refused to meet with him. Dkt. 185, Second Quirk Decl. (Appendix
2) at 3.

In my clinical opinion, Mr. William's potential risk of danger towards others remains high…an elevated PCL-R score, which Mr. Williams was evaluated to have, is correlated with risk of violence towards others. In addition, generally, a history of prior institutional violence (and Mr. Williams has also engaged in serious, stranger violence in the community), is associated with increased rates of future assaultive behaviors. Given the combination of his past institutional and community violence, severe character pathology, presence of emotion dysregulation, his frequent statements of homicidal intent of the years, and continued threats to harm staff, there is a very high probability, in my opinion, that if Mr. Williams is immediately, directly released to a less restrictive setting at this time then he will represent a high risk of danger towards others. He has not evidenced any improvement in these identified areas of concern. Further he has not participated in mental health treatment nor available offender change programming which, if he did, could contribute to reducing his future risk of danger towards others. There is no evidence, that I am aware of at this time, to suggest that Mr. Williams could safely navigate a less restrictive setting at this time. I offer this opinion with a high degree of clinical confidence given the risk factors and concerns listed above and described throughout this declaration and in my prior report.

Dkt. 185 (Second Quirk Decl.) at 10-11.

As the Ninth Circuit has noted:

[T]he precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement. The Supreme Court has written that the test of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), which requires only a reasonable relationship to a legitimate penological interest to justify prison regulations, does not apply to Eighth Amendment claims. *Johnson v. California,* 543 U.S. 499, 511, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) ("[W]e have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. We judge violations of that Amendment under the 'deliberate indifference' standard, rather than *Turner's* 'reasonably related' standard. This is because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment.") (internal citations omitted). The existence of a legitimate penological justification has, however, been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes. *See Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" (quoting *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976))).

*Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014).

The Fourth Circuit in *Porter* also addressed the role of penological justification in conditions of confinement cases, stating:

Perhaps the clearest way penological justification factors into "conditions of confinement cases" is through the subjective prong inquiry because, in a typical Eighth Amendment case, "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have 'presum[ed] malicious and sadistic intent.' " *Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012) (quoting *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999)); *see also, e.g.*, *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018). Put differently, if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement, …—then the official is presumptively acting with deliberate indifference to that risk. But some opinions also treat penological justification as a component of the objective prong analysis. *See, e.g.*, *Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010); *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009). And still others appear to treat it as a separate inquiry. *See Rice ex rel. Rice v. Corr. Medical Svcs.*, 675 F.3d 650, 666 (7th Cir. 2012).

*Porter*, 923 at 362. Yet, the Court in *Porter* ultimately concluded:

Notwithstanding the uncertain role of penological justification in conditions of confinement cases, we believe—contrary to the district court's opinion—that a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement, similar to the challenged conditions on Virginia's death row, even though such conditions create an objective risk of serious emotional and psychological harm. Put simply, prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective.[ ] *Cf. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts.").

*Id.* at 363.

Therefore, although the role of defendants' legitimate penological interest in this Eighth Amendment context is not entirely clear, at a minimum, legitimate considerations of the potential risks to *plaintiff's* health and safety in a less restrictive environment would appear to be relevant to the Court's analysis as to whether defendants acted with deliberate indifference to plaintiff by maintaining him in Max custody. *See, e.g., Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1315 (9th Cir.), *opinion amended on denial of reh'g,* 75 F.3d 448 (9th Cir. 1995) (Noting that "[i]n light of the safety concerns

1    underlying use of the safety cell, the plaintiffs' evidence is not sufficient to compel an

2    inference that the defendants are "knowingly and unreasonably disregarding an

3    objectively intolerable risk of harm[.]" (citing *Farmer*, 511 U.S. at 845)). Even setting

4    aside concerns about the safety of other inmates and DOC staff, the record here

5    reflects that there was a legitimate concern for the safety of the plaintiff himself if he

6    were moved to a less restrictive environment absent some evidence he could refrain

7    from violent and destructive behaviors.

8        Furthermore, to the extent considerations of the safety and security concerns of

9    staff and other inmates are also relevant, defendants have submitted considerable

10   evidence that, given the consistently violent and disruptive nature of plaintiff's behavior,

11   there is a legitimate basis for these concerns.

12       On this record, the Court cannot conclude that plaintiff has raised a genuine

13   issue of material fact as to whether defendants acted with deliberate indifference to

14   plaintiff's health or safety. Accordingly, the Court should find defendants are entitled to

15   summary judgment.

16       The Court notes that in addition to his personal capacity claims, plaintiff also

17   brings claims against defendants Sinclair and Thrasher in their official capacity. "Suits

18   against state officials in their official capacity ... should be treated as suits against the

19   State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Holley v. Cal. Dept. of Corr.*, 599 F.3d

20   1108, 1111 (9th Cir. 2010). An official-capacity suit "represent[s] only another way of

21   pleading an action against an entity of which an officer is an agent." *Kentucky v.*

22   *Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S.

23

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 61

658, 690 n.55 (1978)). Such a suit "is not a suit against the official personally, for the real party in interest is the entity." *Graham*, 473 U.S. at 166.

In an official-capacity suit, the plaintiff must demonstrate that a policy or custom of the governmental entity of which the official is an agent was the moving force behind the violation. *See Hafer*, 502 U.S. at 25; *Graham*, 473 U.S. at 166. "A plaintiff seeking injunctive relief against the State is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citing *Hafer*, 502 U.S. at 25; *Graham*, 473 U.S. at 166). Instead, plaintiff need only identify the law or policy challenged as a constitutional violation and name the official or officials within the entity who can appropriately respond to injunctive relief. *Hartmann*, 707 F.3d at 1127 (citing *Los Angeles Cnty. v. Humphries*, 526 U.S. 29, 35-37, 39 (2010); *Hafer*, 502 U.S. at 25).

Here, as discussed above, plaintiff fails to demonstrate a constitutional violation. He fails to identify any specific deficiency in the relevant policies and fails to show the policies themselves were the moving force behind any alleged violation of his constitutional rights. Accordingly, plaintiff's official capacity claims also fail.

For the foregoing reasons, defendants' motion for summary judgment should be granted and plaintiff's claims challenging his placement and retention in Max custody should be dismissed with prejudice.

### d) Qualified Immunity

Defendants also move for summary judgment and dismissal of plaintiff's claims for money damages based on qualified immunity. They assert that, even if plaintiff had

raised a genuine issue of material fact as to whether defendants violated his Eighth

Amendment rights, defendants would still be entitled to qualified immunity with respect

to money damages because plaintiff fails to demonstrate his placement and retention in

Max custody violated a clearly established right. Plaintiff points to no case law, nor is

the Court aware of any clearly established law, that housing a mentally ill inmate in

substantially similar conditions to DOC's Max custody, where the inmate is placed in

Max custody due to violent/dangerous behavior, is provided access to mental health

treatment, and has the opportunity to progress out of Max custody to a less restrictive

environment through completing offered programming and refraining from violent and

disruptive behavior, violates the Eighth Amendment.

Defendants cite several cases in support of their assertion that it is not clearly

established that housing inmates, even mentally ill inmates, in solitary confinement

constitutes a per se violation of the Eighth Amendment. *See* Dkt. 182 (citing *Anderson*

*v. County of Kern*, 45 F.3d 1310, 1315-16 (9th Cir.) *cert. denied*, 516 U.S. 916 (1995);

*Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1307 (10th Cir. 2021); *Silverstein v. Fed.*

*Bureau of Prisons*, 559 Fed. App'x 739, 759-64 (10th Cir. May 22, 2014)). Plaintiff does

not clearly and directly address the qualified immunity issue in his response.

While there is some case law addressing Eighth Amendment challenges to the

use of solitary confinement, as discussed below, plaintiff fails to show the right in

question was clearly established.

The Ninth Circuit has previously indicated that even an indeterminate sentence in

administrative segregation, without more, does not constitute cruel and unusual

punishment in violation of the Eighth Amendment. *See Anderson*, 45 F.3d at 1315-16

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 63

1    (no contact with any other inmate in administrative segregation, either for exercise, day

2    room access or otherwise not cruel and unusual punishment); *Milliken v. Sturdevant*,

3    No. 18-CV-05326-LHK, 2020 WL 2512381, at *13 (N.D. Cal. May 15, 2020).

4          The Tenth Circuit in *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1307 (10th Cir.

5    2021), has also concluded, in addressing an Eighth Amendment challenge to the

6    placement of mentally ill individuals in solitary confinement, that the State defendants'

7    "general use of punitive isolation to discipline prisoners who happen to be mentally ill

8    does not violate clearly established law."

9          In contrast, the Fourth Circuit in *Porter v. Clark*, 923 F.3d 348, 359 (4th Cir. 2019)

10   recently upheld a district court's award of summary judgment to plaintiffs on their Eighth

11   Amendment claim challenging the conditions of confinement, which included solitary

12   confinement, on death row. In *Porter*, the record showed that the Virginia Department of

13   Corrections placed death-row inmates in solitary confinement, fed them meals through a

14   tray slot, permitted one hour of recreation five days a week, permitted telephone use

15   any day of the week, and permitted them to keep a television and compact disc player

16   in their cells. *Id*. at 353–54. The Court noted there was overwhelming scientific evidence

17   in the record that these conditions of confinement "exact[ ] a heavy psychological toll

18   that often continues to plague an inmate's mind even after he is resocialized." *Id*. at 357

19   (quoting *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015)) (internal quotation

20   marks omitted).

21         The Court in *Porter* concluded that keeping prisoners in a cell at least 23 hours a

22   day, alone, with "no access to congregate religious, educational, or social programming"

23   posed "a substantial risk of serious psychological and emotional harm." *Id*. The Court

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 64

1  noted there was evidence in the record that defendants were, in fact, aware of this

2  substantial risk, and also that this risk was "so obvious that it had to have been known"

3  by prison officials. *Id.* at 361, 364.

4      Yet the Court in *Porter* distinguished the facts that led to its holding, from the

5  holding in another case, *Mickle v. Moore*, 174 F.3d 464 (4th Cir. 1999) - where it found

6  no Eighth Amendment violation – in part on the grounds that the prisoner-plaintiffs in

7  *Mickle* were placed in long-term segregated confinement based on their *in-prison*

8  *conduct* after a series of violent incidents perpetrated by members of the gang, and

9  were removed from segregation if they renounced their membership with the gang.

10 *Porter*, 923 F.3d at 358. The Court stated that "by contrast, [in *Porter*] the challenged

11 Virginia procedures and regulations place death row inmates in solitary confinement

12 based on their sentence alone and do not provide death row inmates with an avenue for

13 removing themselves from segregation." *Id.* at 359.

14     The Court in *Porter* also noted that it believed the district court erred in failing to

15 consider State defendants' penological justification for housing death row inmates in

16 conditions amounting to solitary confinement. *Id.* at 362. The Court indicated it believed,

17 contrary to the district court's opinion, that "a legitimate penological justification can

18 support prolonged detention of an inmate in segregated or solitary confinement, similar

19 to the challenged conditions on Virginia's death row, even though such conditions

20 create an objective risk of serious emotional and psychological harm." *Id.* However,

21 because the defendants failed to raise this issue on appeal, the Court found it was

22 waived. *Id.*

23

24

25 REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 65

The holding in *Porter* does not squarely address the circumstances of Mr. Williams' case; in this case, plaintiff is not on death row, defendants present evidence that plaintiff was placed in Max custody based upon his in-prison conduct, their Max custody policy provides an avenue for release, and evidence is also presented of a legitimate penological justification for plaintiff's prolonged detention. *Id.*

The Court notes that the U.S. District Court for the Northern District of California decided, in a published opinion, that housing severely mentally ill inmates in solitary confinement, under particular circumstances, would be a violation of the Eighth Amendment. In *Madrid v. Gomez*, 889 F. Supp. 1146, 1259 (N.D. Cal. 1995), the Court found an Eighth Amendment violation where the record showed plaintiffs' placement in solitary confinement interfered with the prisoners' ability to obtain adequate mental health treatment and there were systemic deficiencies at the facility, *e.g.*, deficiencies in mental health programming, screening, staffing levels, and accountability, and "[d]efendants knew they were subjecting the inmate population to a substantial risk of serious harm by virtue of their utter failure to provide for adequate medical and mental health care." *Id.*

However, in a recent unpublished district court opinion from this district, *Denton v. Rainer*, No. C-19-5743-BHS, 2023 WL 5609213 (W.D. Wash. Aug. 30, 2023), the Hon. Benjamin H. Settle granted summary judgment for DOC defendants finding plaintiff's Eighth Amendment rights were not violated by housing him in Max custody despite his mental health issues. Specifically, the Court found that, although defendants were on notice that long-term isolation was negatively affecting plaintiff's mental health based upon their receipt of a psychiatric evaluation of plaintiff and report that made this

clear, the record showed defendants took "reasonable measures to abate the risks to plaintiff's mental health" and "actively engaged with him to encourage his compliance and to devise a plan that would help him be successful outside of Max custody." *Id.*

Although these cases from U.S. District Courts analyze issues similar to this case, generally the opinion of a U.S. District Court would not be sufficient, standing alone, to demonstrate a right is clearly established. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (noting "[m]any Courts of Appeals ... decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity" because they are not binding precedent); *Crane*, 15 F.4th at 1306–07 ("District court cases lack the precedential weight necessary to clearly establish the law for qualified immunity purposes.").

The Court concludes that defendants are entitled to qualified immunity as to plaintiff's claims for money damages related to his placement and retention in Max custody and those claims should be dismissed on that basis as well.

### 2. Disruptive Hygiene Behavior Response Protocol

Defendants allege plaintiff failed to exhaust the administrative remedies available to him with respect to his challenges to the Disruptive Hygiene Behavior Response Protocol ("the Protocol").[15] Plaintiff contends he exhausted his administrative remedies with respect to this issue by appealing to the final level of review on June 21, 2023. Dkt. 199 at 26.

---

[15] The Court notes that defendants raised the affirmative defense of exhaustion for the first time in their answer. *See* Dkt. 32. The defendants also initially raised this affirmative defense with respect to Claim I, the Eighth Amendment challenge to plaintiff's solitary confinement/Max custody status. Dkt. 125, at 3; Dkt. 182 at 11. The defendants later withdrew this affirmative defense with respect to Claim I but maintain it with respect to Claim II, challenging the Protocol. Dkt. 201 at 9-10.

Before a prisoner may bring a civil rights action under 42 U.S.C. § 1983, he must

first exhaust all available administrative remedies. Under the Prison Litigation Reform Act

of 1995 ("PLRA"),

> No action shall be brought with respect to prison conditions under section 1983 of
> this title, or any other Federal law, by a prisoner confined in any jail, prison, or other
> correctional facility until such administrative remedies as are available are
> exhausted.

42 U.S.C. § 1997e(a).

Exhaustion in cases covered by § 1997e(a) is mandatory. *Booth v. Churner*, 532

U.S. 731, 739 (2001). The mere fact a plaintiff has filed an initial grievance under a

prison's grievance policy does not satisfy the PLRA exhaustion requirement; a plaintiff

must exhaust *all* levels of an available grievance procedure before he can initiate

litigation. *See id.* at 736-41; *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

Even when the prisoner seeks relief not available in grievance proceedings,

notably money damages, exhaustion is still a prerequisite to suit. *Booth*, 532 U.S. at 741.

If a claim is not exhausted, it must be dismissed. *McKinney v. Carey*, 311 F.3d 1198,

1199 (9th Cir. 2002). Administrative remedies must be exhausted prior to the

commencement of an action and may not be exhausted during the pendency of a

lawsuit. *See McKinney*, 311 F.3d at 1199 ("prisoner does not comply with [PLRA

exhaustion] requirement by exhausting available remedies during the course of the

litigation") (citations omitted).

Failure to exhaust administrative remedies is properly brought as a summary

judgment motion or as a defense to a summary judgment motion. *Albino v. Baca*, 747

F.3d 1162, 1168 (9th Cir. 2014). Once the defendant proves there was an available

administrative remedy and the offender failed to exhaust the available remedy, the

burden shifts to the plaintiff. The plaintiff must show there was something about his claim which made the "existing and generally available administrative remedies effectively unavailable to him[.]" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996)).

In support of their motion, defendants submit the declaration of Carol Smith, Resolution Program Manager in the Office of Correctional Operations for the DOC. Dkts. 186 (Declaration of Carol Smith), 186-1 (internal citations omitted). Defendants' evidence shows that the DOC's Offender Grievance/Resolution Program has been in existence since the early 1980's and was implemented on a Department-wide basis in 1984. *Id.* Under the program, incarcerated individuals may file resolution requests on a wide range of issues relating to their incarceration including challenges to: 1) Department policies, rules, and procedures; 2) the application of such policies, rules, and procedures; 3) the lack of policies, rules, or procedures that directly affect the living conditions of the offender; 4) the actions of staff and volunteers; 5) the actions of other incarcerated individuals; 6) retaliation by staff for good faith participation in the Resolution Program; and 7) Health Services. *Id.* at 1-4.

Incarcerated individuals receive an orientation to the resolution procedure upon their arrival at the facility. *Id.* Resolution request complaint forms are made available to all inmates and copies of the manual are maintained in the prison law library. *Id.* In order to ensure the confidentiality of the resolution request and maintain the integrity of the program, incarcerated individuals place their resolution request forms in a locked box in the housing units. *Id.* Resolution requests are sealed and collected directly from inmates housed in the segregation units who do not have access to a locked box. *Id.*

1    The resolution requests are then collected by the prison grievance coordinator for

2    processing. *Id.* (Smith Decl.).

3            The resolution procedure consists of four levels of review:

4            Level 0 – Complaint or informal level. *Id.* The Resolution Specialist at the prison

5    receives a written complaint from an incarcerated individual on an issue about which the

6    incarcerated individual wishes to pursue a resolution. *Id.* At this complaint level, the

7    Resolution Specialist determines if the resolution request is acceptable or not (following

8    the guidelines outlined in the Resolution Program Manual), sends the resolution request

9    back for more information or rewrite if necessary, and/or attempts to informally resolve

10   the concern or promote accepted concerns for a Level I review. *Id.* The resolution

11   specialist might try to answer questions, suggest other processes available or take

12   action themselves in an attempt to informally resolve the concern. *Id.* If an individual

13   does not feel their concern has been resolved, they can appeal the response by

14   submitting a new Resolution Request and including the same Log ID number as is on

15   the informal response. *Id.*

16           Level I – First formal review. *Id.* The handwritten concern is transcribed onto

17   DOC 05-166 Level I Resolution Response and a copy is sent to the individual. *Id.* The

18   Resolution Specialist is the respondent at this level. *Id.*

19           Level II – Second formal review. *Id.* Incarcerated individuals may appeal Level I

20   Resolution Requests to Level II. *Id.* The handwritten concern is transcribed onto DOC

21   05-168 Level II Resolution Response and a copy is sent to the individual. *Id.* The Level

22   II Appeal is assigned to an employee/contract staff. *Id.* Once the review is complete, the

23   Superintendent or Health Services Administrator issues a formal response. *Id.*

24

25   REPORT AND RECOMMENDATION ON
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
     MOTION FOR EXTENSION OF TIME (DKT. 198) - 70

1    Level III – Third and final formal review. *Id.* (Smith Decl.). The appeal is

2 reviewed/accepted/transcribed onto DOC 05-169 Level III Resolution Response and

3 sent to Headquarters Resolution Program Unit. *Id.* The Appeal is assigned for review by

4 the Resolution Program Manager/designee. *Id.* Once the review is complete, the Deputy

5 Secretary/designee issues the formal response. *Id.* This is the Department's final level

6 of review and cannot be appealed. *Id.*

7    Emergency resolution requests are those that the resolution would be too late if

8 handled through routine administrative or resolution channels and meet certain

9 emergency criteria. *Id.* Emergency resolutions are immediately addressed to determine

10 if they meet the definition of an emergency, and an individual may appeal a non-

11 emergent determination. *Id.* If an emergency resolution request is deemed non-

12 emergent, it will then be processed through normal resolution channels. *Id.*

13    Individuals have twenty working days from the date of an incident to file a

14 resolution. *Id.* Individuals then have ten working days from the time they receive a

15 response to Level I and II resolutions to appeal. *Id.* An individual cannot appeal a Level

16 III decision. *Id.*

17    Ms. Smith also indicates that while the resolution/grievance program has made

18 small adjustments over the years, since she has held the position of Resolution

19 Program Administrator, it has consisted of three levels as identified above; there has

20 always been a deadline by which an individual must submit their initial

21 grievance/resolution request; and, there has consistently been a limited timeframe

22 within which an individual has to appeal a response to the next level. *Id.*

23

24

25 REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 71

Ms. Smith states she is familiar with plaintiff and has had the opportunity to review his resolution records. *Id.* (Smith Decl.). She states DOC records show that plaintiff has submitted 1,095 grievances/resolution requests dating back to 1995 and of these grievances, *none of them* have been pursued to level three of the program in effect at that time. *Id.*

Based on the evidence detailed above, the Court finds defendants carried the initial burden of showing the absence of exhaustion in this case with respect to plaintiff's challenges to the Protocol. Defendants present evidence that there was a grievance procedure in place during the period in question and plaintiff did not complete the grievance process challenging the Protocol prior to commencing this action.[16]

The burden now shifts to plaintiff who must show that there is something particular in his case that made the existing and generally available remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Williams*, 775 F.3d at 1191 (quoting *Albino*, 747 F.3d at 1172). Acts by prison officials preventing the exhaustion of administrative remedies may make administrative remedies effectively unavailable. *See Nunez v. Duncan*, 591 F.2d 1217, 1224-25 (9th Cir. 2010). "The ultimate burden of proof, however, remains with the defendants," and the evidence must be viewed in the light most

---

[16] The Court notes that Ms. Smith's declaration does not detail the specifics of every grievance or resolution program in effect prior to her tenure as program manager, beginning in March 2020. However, she does assert she has reviewed the relevant DOC records dating back to 1995, and that plaintiff has not pursued any of his grievances to level three of the program in effect at that time. In light of the fact that the operative complaint does not identify any specific dates or times when plaintiff alleges his rights were violated under the Protocol, and given that, as discussed below, plaintiff does not challenge the assertion or the evidence that he did not properly exhaust his remedies prior to filing his complaint, the Court finds defendants' evidence sufficient to establish that plaintiff failed to exhaust his administrative remedies.

favorable to the plaintiff. *Paramo,* 775 F.3d at 1191 (citing *Albino,* 747 F.3d at 1172). The

Supreme Court held there are three circumstances in which an administrative remedy is

not capable of potential relief:

> First, an administrative procedure is unavailable when it operates as a simple dead
> end—with officers unable or consistently unwilling to provide any relief to aggrieved
> inmates. Next, an administrative scheme might be so opaque that it becomes,
> practically speaking, incapable of use—i.e., some mechanism exists to provide
> relief, but no ordinary prisoner can navigate it. And finally, a grievance process is
> rendered unavailable when prison administrators thwart inmates from taking
> advantage of it through machination, misrepresentation, or intimidation.

*Ross v. Blake,* 136 S. Ct. 1850, 1853–1854 (2016).

Plaintiff does not dispute his awareness of the grievance process or that he failed

to exhaust his administrative remedies with respect to this issue prior to commencing this

lawsuit. Rather, plaintiff contends he exhausted his administrative remedies with respect

to this issue by appealing to the final level of review on June 21, 2023[17], while this action

(including his claims challenging the Protocol) was pending. But plaintiff did not comply

with the PLRA exhaustion requirement by taking steps to exhaust available remedies

during the course of the litigation. As the Ninth Circuit has acknowledged, "[w]hile it is

true that requiring dismissal [where prisoners have not exhausted their remedies prior to

filing suit] may, in some circumstances, occasion the expenditure of additional

resources on the part of the parties and the court, it seems apparent that Congress has

---

[17] The Court notes that Carol Smith's declaration, which asserts plaintiff had not pursued any of
his grievances to level three of the program in effect at the time, was signed on June 16, 2023,
prior to the date plaintiff alleges he appealed his grievances on this issue to level three.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 73

1  made a policy judgment that this concern is outweighed by the advantages of requiring

2  exhaustion prior to the filing of suit."[18] *McKinney*, 311 F.3d at 1200.

3      The record shows plaintiff failed to exhaust the administrative remedies available

4  to him with respect to this claim prior to commencing his lawsuit. Therefore, the Court

5  should grant defendants' motion for summary judgment and this claim should be

6  dismissed without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003)

7  *overruled on other grounds by Albino,* 747 F.3d at 1162 ("If the district court concludes

8  that the prisoner has not exhausted nonjudicial remedies, the proper remedy is

9  dismissal of the claim without prejudice.").

10      III.    IN FORMA PAUPERIS STATUS ON APPEAL

11      The Court must also decide whether plaintiff's *in forma pauperis* status should

12  continue on appeal. *See* 28 U.S.C. §1915(a)(3) ("an appeal may not be taken *in forma*

13  *pauperis* if the trial court certifies in writing that it is not taken in good faith"). The Court

14  must determine whether appeal is frivolous or malicious, or whether it fails to state a

15  claim on which relief may be granted. *See* 28 U.S.C. §1915(e)(2)(B)(i)&(ii).

16  _____

17  [18] The Ninth Circuit noted that "the objectives that Congress sought to achieve in enacting §
1997e(a) were identified by the Supreme Court in *Porter v. Nussle,* 534 U.S. 516, 524–25, 122
S.Ct. 983, 152 L.Ed.2d 12 (2002)", where the Court stated:

18      Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve
      the quality of prisoner suits; to this purpose, Congress afforded corrections

19      officials time and opportunity to address complaints internally before allowing the
      initiation of a federal case. In some instances, corrective action taken in response

20      to an inmate's grievance might improve prison administration and satisfy the
      inmate, thereby obviating the need for litigation. *Booth,* 532 U.S. at 737, 121
      S.Ct. 1819. In other instances, the internal review might "filter out some frivolous

21      claims." *Ibid.* And for cases ultimately brought to court, adjudication could be
      facilitated by an administrative record that clarifies the contours of the

22      controversy. See *ibid.;* see also *Madigan,* 503 U.S. at 146, 112 S.Ct. 1081.
*Porter,* 534 U.S. 524–25. Thus, the Ninth Circuit reasoned, "[r]equiring dismissal without

23  prejudice when there is no presuit exhaustion provides a strong incentive that will further these
Congressional objectives; permitting exhaustion *pendente lite* will inevitably undermine

24  attainment of them." *McKinney*, 311 F.3d at 1200.

25  REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. 182), AND ORDER STRIKING PLAINTIFF'S
MOTION FOR EXTENSION OF TIME (DKT. 198) - 74

1    While the Court was not persuaded on the merits of plaintiff's claim, there is no

2 evidence that his appeal is frivolous or is taken in bad faith. Accordingly, the Court

3 recommends that *in forma pauperis* status should continue on appeal.

4                          IV.    <u>CONCLUSION</u>

5    Based on the foregoing discussion, the Court **orders** that plaintiff's motion for

6 leave to file a late pleading (Dkt. 198)  is **stricken** as unnecessary, and moot.

7    The Court should GRANT defendants' motion for summary judgment (Dkt. 182).

8 The Court should dismiss with prejudice plaintiff's claims challenging his placement and

9 retention in Max custody and should dismiss without prejudice plaintiff's claims

10 challenging the Disruptive Hygiene Behavior Response Protocol for failure to exhaust

11 his administrative remedies.

12    Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall

13 have fourteen (14) days from service of this report to file written objections. *See also*

14 Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for

15 purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can

16 result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474

17 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations

18 omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is

19 directed to set the matter for consideration on **January 26, 2024**, as noted in the

20 caption.

21    Dated this 2nd day of January, 2024.

22

23                                            *Theresa L. Fricke*

24                                            Theresa L. Fricke
                                             United States Magistrate Judge

25 REPORT AND RECOMMENDATION ON
   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
   (DKT. 182), AND ORDER STRIKING PLAINTIFF'S
   MOTION FOR EXTENSION OF TIME (DKT. 198) - 75